## DOYLE v. FAUST.

1. PRINCIPAL AND SURETY—CONSIDERATION—DISCHARGE—CHANGE IN CONTRACT.

A surety on a contractor's bond is not relieved from liability by the fact that some variation occurred in the performance of the contract of construction, but it may insist upon compliance with any requirements which are strictly a condition of liability.

2. SAME:

The obligation of a surety under a contract which refers to a construction agreement and to specifications, etc., depends upon the contract and the accompanying specifications and should be read with them in interpreting its terms.

3. SAME—ALTERATIONS—EXTENT OF LIABILITY.

Under a construction bond, given in consideration of a sum paid to the surety, providing that the building contractor should pay all demands for material and labor used in completing the building as specified in the contract, and under a clause stipulating that the owner should be permitted to change the specifications without avoiding his contract, any doubt that may exist as to the materiality of changes made and whether they were authorized under the agreement should be determined against the surety in the bond.

4. SAME—DISCHARGE—CONSTRUCTION CONTRACT—CHANGES.

Any alteration made in the walls, partitions, windows, etc., in a building to be occupied for store or shop purposes, not materially changing exterior appearance and dimensions, does not operate to discharge the contractor or surety under the clause permitting changes to be made.

5. SAME—TIME—PENALTY—DELAY IN CONSTRUCTION.

Unless the changes which were required by the owner resulted in the construction work taking more time than the original agreement specified, the clause requiring the contractor to complete the building within a stated period would not preclude them.

6. SAME—ARCHITECT—RELEASE OF SURETY.

The owner of such building was not authorized to make payments to the contractor in excess of the amounts stated in the certificate by reason of a letter which the architect wrote enclosing the certificate for the correct amount due and suggesting that the owner secure orders from the contractors for the amounts due for labor and materials.

7. SAME—DISCHARGE—BOND—INJURY TO SURETY.

Where the surety in the bond undertook for a consideration to secure the owner against the failure of the contractor to pay claims for labor and materials, he was not released because payments were made to the contractor in excess of the amount due him, the contract providing that the owner should pay a certain proportion of the value of the structure so far as completed on the architect's certificate, but where the payments made did not equal the proportion named in the contract, based upon the earnings of the contractor including extras.

Error to Genesee; Wisner, J.  Submitted June 12, 1914.  (Docket No. 35.)  Decided July 23, 1915.  Rehearing denied December 22, 1915.

Assumpsit by Thomas Doyle and another against Joseph Faust and others for work, labor, and materials. Judgment for plaintiffs.  Defendants bring error. Affirmed.

*Warren, Cady & Ladd* (*Thomas Stockton* and *Emil Hoen*, of counsel), for appellant Bankers' Surety Co.

*Brennan, Cook & Gundry*, for appellees.

The Faust-Scheel Company, a copartnership, contracted with plaintiffs to construct for them, furnishing all material and labor, a certain building for $9,-945—

"subject to additions and deductions as provided in the general conditions of the specifications and that such sum shall be paid by the owner to the contractor, in current funds, and only upon certificates of the architect, as follows:

"Ninety per cent. of the value of the completed work, upon estimates made by the architects, every two weeks as the work progresses until it is entirely completed.

"The final payment including the ten per cent., previously withheld, shall be payable within 30 days after the entire completion and acceptance, by the architect, of the work covered by this contract."

The general specifications provided that:

"The architect shall have the power to require alterations in the work as shown or described in the said drawings or specifications, and the contractor shall proceed and make such changes without causing delay.  In every such case the price agreed to be paid for the work under the contract shall be increased or decreased as the case may require, according to a fair and reasonable valuation of the work, added or omitted, and the value of such work shall be fixed by fair ad-

measurement and valuation made by the architect or some competent person appointed by him. Such alterations or variations shall in no way render void the contract, and no claim for variations or alterations or the increased or decreased price thereof shall be valid unless done in pursuance of an order from the architect and notice of such claim made to him in writing before the commencement of such work."

Another specification is:

"Should the contractor become insolvent or at any time refuse or neglect to supply a sufficiency of properly skilled workmen or of materials of the proper quality or fail in any respect to prosecute the work with promptness and diligence or fail in the performance of any of the agreements herein contained, such refusal, neglect or failure being certified by the architect, the owner shall be at liberty after 48 hours' written notice to the contractor to provide any such labor or materials and to deduct the cost thereof from any money then due, or thereafter to become due, to the contractor, under the contract, and if the architect shall certify that such refusal, neglect or failure is sufficient ground for such action, the owner shall also be at liberty to terminate the employment of the contractor for the said work, and to enter upon the premises and take possession, for the purpose of completing the work included under the contract, of all materials, tools, and appliances thereon and to employ any other person or persons to finish the work and to provide the materials therefor; and in case of such discontinuance of the employment of the contractor the contractor shall not be entitled to receive any further payment under the contract until the said work shall be wholly finished, at which time if the unpaid balance of the amount to be paid under the contract shall exceed the expense incurred by the owner in finishing the work, such expense shall be paid by the owner to the contractor; but if such expense shall exceed such unpaid balance the contractor shall pay the difference to the owner. The expense incurred by the owner as herein provided either for furnishing material or for finishing the work, or any damage incurred through such default, shall be audited and certified by the arch-

itect whose certificate thereof shall be conclusive upon the parties."

The contract was dated July 27, 1910, and contained the further provision that the whole of the work should be completed on or before the 1st day of November, 1910, that time was an important element, and that for every day the work remained unfinished beyond the date fixed for its completion the contractors should pay the owners as stipulated damages $6.50 a day, and if completed before November 1, 1910, the owners should pay the contractors a like sum for each day saved, as a bonus.

The contractors as principals and the defendant surety company made and delivered to the owners an undertaking, in writing, which recited the entering into of the said contract for construction by the said principals, by which the said principals and the surety were bound to the owners in the sum of $5,000, and in which the surety—

"guarantees that said principals * * * shall fully pay, discharge and liquidate all claims, accounts and indebtedness of the said principals, * * * for or on account of all labor performed and materials furnished in fulfilling said contract. * * *"

The general condition of the bond is that the contractors shall fully pay, discharge, and liquidate all claims, accounts, and indebtedness of the principals for or on account of all labor performed and materials furnished in fulfilling the said contract and performing the several conditions as the same may become due and payable. The premium paid the surety company for its undertaking was based upon the contract price. The bond was prepared by the architect, acting for the owners. The original plans and specifications were submitted to various bidders for construction, and upon them the bid of the contractors was based.

There were prospective tenants of the proposed new

building, and there was a building on the site to be occupied by it. The purpose of the owners was to use the south wall thereof as the south wall of the new building and to use a party wall already erected on the north side of the new building. After the work was begun, there was a failure of the owners and the prospective tenants to agree, and the owners instructed the architect to make amended plans, and such plans were prepared. The building is 98 feet and 7 inches long and 37½ feet wide. The original plans divided it by cross-partitions into three rooms; the new plans made of it two separate store buildings, divided lengthwise of the building by a 12-inch brick wall constructed from the bottom of the cellar to the ceiling of the first story. This wall is 106 feet long and 21 feet high. It was found, too, that the party wall on the north was not strong enough to carry the building and an additional wall, 4 inches thick, was built, from the floor of the basement to the roof. The south wall of the old structure was found to be defective, was removed, and a new 16-inch brick wall built the entire length of the building on the south side. An extra chimney 43 feet high was built on the north side of the building and an outside entrance stairway to the second floor in place of an inside stairway as originally planned. Twelve extra windows were placed on the south side of the building. The front windows as planned were changed in the second story. Other considerable changes from the original plans were made. Some of these changes were made after the work called for by the original plans had been installed. All were made without the knowledge and without notice to the surety company. Payments were made to the contractors by the owners without first having received certificates from the architect, the amount so paid exceeding the amount of the judgment. And, after having notice that unpaid demands against the contractors existed,

the owners paid directly to the contractors considerable sums of money, although the contract provides that:

"If at any time there shall be evidence of any lien or claim for which, if established, the owner of the said premises might become liable, and which is chargeable to the contractor, the owner shall have the right to retain out of any payment then due or thereafter to become due to the contractor an amount sufficient to completely indemnify the owner against such lien or claim."

The owners notified the contractors to quit, and they did, and the owners finished the building. Architect's certificates had then been given them to the amount of $7,025. In the estimates given from time to time, some of the extras were included. The architect testified that he did not always give written orders for extras and considered that condition of the contract abrogated. The architect and contractors did not agree as to the value of extras already installed. Arbitrators found that the contractors had earned $2,265 for extras and had been saved $1,140 by omissions in work called for by the original plans, leaving a balance in favor of the contractors, in this respect, of $1,125. They brought this action against the contractors and surety, and in the bill of particulars specify their demand as follows:

| | | |
|---|---:|---:|
| Original contract price............ | | $9,945 00 |
| Extras as per contract............ | | 1,125 00 |
| Total ......................... | | $11,070 00 |
| Money paid Faust-Scheel Company on contract .................... | $7,136 00 | |
| Moneys paid for materials and labor, freight, express and drayage, at request of Faust-Scheel Company, viz.: | | |
| Material ........................ | 339 20 | |
| Labor .......................... | 650 88 | |
| Freight, express, drayage.......... | 64 61 | |
| Money to satisfy liens............ | 3,009 95 | |

```
Cost of completing contract........ $1,504 18
                                    _____
                                    $12,704 82
Damages for delay as per contract,
   200 days, $6.50 per day..........  1,300 00
                                    _____
   Total .........................$14,004 82
Total contract price...............          11,070 00
                                            _____
Balance due Doyle & Whaley from
   defendants .....................           $2,934 82
```

The contractors, who are or were irresponsible financially, were defaulted. The defendant surety company with its plea gave notice that it would insist that it had been released because the plaintiffs failed to hold 10 per cent. of the amount of the estimates issued by the architect, had paid the contractors large sums without having the architect's certificate therefor, and because the contract was radically and materially changed by agreement between the plaintiffs and contractors, new plans and specifications adopted for the erection of a building of a character different from the one originally proposed at a materially increased cost, without the knowledge or consent of this defendant.

The computation which was presented by plaintiffs, and which was the basis for the verdict which was returned, was as follows:

```
Original contract price..............     $9,945 00
Unfinished work at the date of the
   cancellation of the contract, as per
   Exhibit 19½ .....................       1,504 18
                                          _____
So that there was left of the original
   contract which was considered in
   the computation at the time of the
   arbitration ......................      8,440 82
Difference between the omissions and
   extras as fixed by arbitration.....     1,125 00
                                          _____
                                          $9,565 82
Which is the amount earned by the
   contractors at the time the contract
   was canceled.
```

There has been paid as follows:

| | | |
|---|---:|---:|
| Pay rolls | $626 | 08 |
| Architect's certificate dated August 5, 1910 | 200 | 00 |
|     Paid by check dated August 6, 1910. | | |
| Certificate dated August 20, 1910.. | 1,125 | 00 |
|     Paid by checks dated July 30, August 6, August 12, and August 20. | | |
| Certificate dated September 2, 1910, | 250 | 00 |
|     Paid by check dated September 30, 1910. | | |
| Certificate dated September 16, 1910, | 900 | 00 |
|     Paid by check dated September 17th. | | |
| Certificate dated October 14, 1910.. | 2,850 | 00 |
|     Paid by check dated August 14, 1910. | | |
| Certificate of October 29, 1910..... | 500 | 00 |
|     Paid by check dated October 29, 1910. | | |
| Certificate dated November 26, 1910, | 1,200 | 00 |
|     Paid by check to the Brick Company dated October 10....$113.00 | | |
|     By check dated November 12, 1910.... 235.37 | | |
|     By check dated November 26, 1910.... 851.63 | | |
| Check to Fred Scheel dated October 1, 1910 | 189 | 00 |
|   No certificate. | | |
| Paid to Charles Hart, roofer, as per order of Faust-Scheel Company, | 210 | 00 |
|   As shown by check dated December 3, 1910. | | |
| Paid to Smith, Bridgman.......... | 5 | 20 |
| January 9, 1911, paid to the Grand Trunk, for freight............. | 57 | 30 |
|   As shown by check dated September 30, 1910. | | |

Express ........................ $2 42
   As shown by ·check dated Decem-
      ber 17, 1910.
To Fred Lane, for draying........ 4 68
   As shown by check dated January
   3, 1911.

| | | |
|---|---:|---:|
| Total amount paid at time of cancellation of the contract.........$8,120 68 | | |
| Ten per cent. of $9,565.82 equals.. | | $956 58 |
| Which, deducted from the amount earned by contractors, leaves, | | $8,609 24 |
| Which could have been paid to the contractors and not exceeded 90 per cent. of the contract price. | | |
| Amount actually paid............ | | 8,120 68 |
| Leaving a balance of............. | | $488 56 |
| Less than 90 per cent. of the contract price earned. | | |
| Computation as to the amount due by contractors and surety: | | |
| Contract price ................. | | $9,945 00 |
| Extras over and above omissions at the date of the cancellation of the contract........ | | 1,125 00 |
| Total ...................... | | $11,070 00 |

Credits.

| | | |
|---|---:|---:|
| Unfinished at date of cancellation, | $1,504 18 | |
| Paid ........................... | 8,120 68 | |
| Paid to materialmen as follows: | | |
|    Barney ....................... | 1,122 45 | |
|    Hubbard & Son........:..... | 802 66 | |
|    Dain & Vermilya............. | 727 75 | |
|    Genesee Iron Work........... | 151 91 | |
|    Veit & Davison.............. | 595 94 | |
|    Valley Cornice Company...... | 392 70 | |
|       Total ....................$12,408 27 | | $12,408 27 |
| Leaving a balance to Doyle and Whaley from contractors and surety ........................ | | $1,333 27 |

Counsel for neither party appear to have regarded the case as presenting any question for a jury, and the court, upon plaintiffs' motion, directed a verdict for plaintiffs for $1,333.27, upon which judgment was entered; the court having refused defendant's motion to direct a verdict in its favor. Error is assigned upon the refusal to direct a verdict for defendant surety company and upon the charge in which a verdict for plaintiffs was directed.

The propositions presented by appellant are:

*First,* that material and radical changes in the contract released the surety; *second,* that the surety company is released because payments were made by the owners direct to the contractors without a certificate of the architect, contrary to the provisions of the contract; *third,* that the surety company must be released *pro tanto* on account of any funds paid out by the owners to the contractors after they (the owners) had knowledge that the contractors owed large sums for material used in the building; *fourth,* the bond did not authorize the owners to pay parties furnishing material who had not obtained a lien upon the property.

OSTRANDER, J. (*after stating the facts*). In this, and in all similar cases, it is to be said, generally, that the agreement sued upon measures the undertaking of the surety. The surety may not stand upon the strict letter of its undertaking and demand to be released therefrom for any and every variation in the terms or the performance of its principal's contract, with reference to which the surety's agreement is made, but it may insist upon the compliance with requirements, clearly expressed, which are made the condition to liability.

"Conceding that" the contract of the surety company "should be construed as insurance contracts, and taken most strongly against the company issuing them, still, where they [the terms] are clear and unambiguous, the principle invoked cannot be availed of to

refine away the terms of a contract deliberately entered into, and expressed with sufficient clearness to convey the plain meaning of the parties." *Granite Building Co.* v. *Saville's Administrator,* 101 Va. 217 (43 S. E. 351).

"The rule of construction applicable to a contract of insurance, in cases where, as in this one, the legislature has not prescribed a standard policy, is settled to the effect that if there is any ambiguity in the language of a condition, or it is fairly open to two constructions, one of which will uphold and the other defeat the claim of the insured, that should be adopted which is most favorable to the insured. The rule of strict construction against the insurer and the liberal one in favor of the insured must prevail under such circumstances. If, however, the terms of the contract be clear, and not fairly susceptible of two constructions, an ambiguity cannot be assumed, and the plain intention of the parties nullified by construction." *George A. Hormel & Co.* v. *Bonding Co.,* 112 Minn. 288, 293 (128 N. W. 12, 14, 33 L. R. A. [N. S.] 513, 520).

The contract of the surety company refers to and must be read with the contract of its principals and the owners of the building. Both must be read with the specifications.

It will be noticed that the surety did not undertake that the contractors should complete the building, but that they should pay, discharge, and liquidate all demands on account of labor and materials employed in its construction. The amount for which they might be held liable depended, necessarily, upon the character of the building to be erected, the quantity of material likely to enter into its construction, the labor necessary to erect it. It was contemplated, however, there might be alterations in the plans as shown and described in the drawings and specifications, and the surety will be presumed to have consented, in advance, to such alterations as might be made without avoiding the contract—such as the owners might call upon the contractors to make. 6 Cyc. p. 83; 32 Cyc. p. 188.

The fact that the contractors proceeded, under the direction of the architect and owners, to make additions and alterations, would not be controlling unless they were such as the contract permitted. But, if it is doubtful whether the changes made were permitted, the doubt, in so far as it is based upon the terms of the contract and their construction, will be resolved against a corporation surety which for hire insured the payment of accounts for the labor and material. See *George A. Hormel & Co.* v. *Bonding Co., supra,* and the collection of cases in the note to same in 33 L. R. A. (N. S.) 513.

The contract does not define or limit, as it might have done, the changes which the architect might make in the plans without avoiding the contract. Power to require alterations is expressly given with the provision that "such alterations or variations shall in no way render void the contract." Undoubtedly, there is a reasonable limit within which, in such a case, alterations may be made without avoiding the contract; or, to state the proposition otherwise, there is a reasonable limit beyond which, if alterations are made, the surety would be released. The question presented, and it appears that counsel regard it as a question of law and not of fact, is whether, in view of the surety's consent and the actual changes made, it ought to be said that the contract which the principals undertook to perform, the one they actually proceeded to carry out, was another and different contract from the one the surety made the basis of its undertaking, or so materially different that it was not fairly within the scope of its undertaking. Cases may be supposed in which this would be a question for a jury. Upon this record we think it must be answered in the negative. That material changes were made is evident, but the power of the architect is not limited to immaterial changes and alterations. It is matter of common knowledge

that material changes are often made in plans and specifications for the erection of any considerable building. What was contemplated, and what was erected, was a structure of certain dimensions, upon a particular site—a store building. The general character of the building contemplated and the one erected is the same, the materials employed were, generally, of the kind originally contracted for. Construing the provision for alterations liberally, we are of the opinion that the consent of the surety extended to such as the record shows were made.

We have not overlooked the argument that the provision for damages to be paid by the contractors if the work was not completed upon a day certain indicates that it was not contemplated by the parties to the contract that no considerable alterations or changes in the plans should be made. The changes involved the omitting to do much that the original plans required to be done. If it required more time to build the structure erected than to build one first planned, the difference is not made to appear, and, in any event, the clause providing for damages must be read with the one permitting alterations.

Directly sustaining this conclusion, or containing reasoning supporting it, are the opinions in the followlowing cases: *Fullerton Lumber Co.* v. *Gates,* 89 Mo. App. 201; *George A. Hormel & Co.* v. *Bonding Co.,* 112 Minn. 288 (128 N. W. 12, 33 L. R. A. [N. S.] 513); *Fidelity & Deposit Co.* v. *Robertson,* 136 Ala. 379 (34 South. 933); *Hedrick* v. *Robbins,* 30 Ind. App. 595 (66 N. E. 704); *Burnes* v. *Fidelity & Deposit Co.,* 96 Mo. App. 467 (70 S. W. 518); *Wolf* v. *Indemnity Co.,* 163 Cal. 597 (126 Pac. 470); *McLennan* v. *Wellington,* 48 Kan. 756 (30 Pac. 183); *Drumheller* v. *Surety Co.,* 30 Wash. 530, 536 (71 Pac. 25); *Hayden* v. *Cook,* 34 Neb. 670 (52 N. W. 165); *People's Lumber Co.* v. *Gillard,* 136 Cal. 55 (68 Pac. 576). There are,

of course, opinions to the contrary which apply the rule that the surety may stand upon the letter of his contract.

Manifestly, it was to the interest of the surety that the money paid by the owners should go to the liquidation of the demands to pay which it might become liable. Ninety per cent. of the value of completed work was by the agreement to be paid upon estimates made by the architect every two weeks as the work progressed, and until it was entirely completed. The provision is unlike that found in many building contracts, which is that estimates shall be made of the value of the material and labor which has entered into the structure. In one case the value of completed work, if based upon the price to be paid for the structure, would include the profits of the contractors; in the other case it might not include profits. The making of estimates involved the exercise of the sound professional judgment of the architect. The estimates furnished the basis upon which 10 per cent. of the value was retained in the hands of the owners until the contract was completed. When the contractors quit, they had been paid $8,120.68, and certificates had been given for $7,025. It is said by plaintiffs that they paid $1,095.68 upon a general certificate in the form of an advisory letter written by the architect, and that in view of the sum allowed by the arbitrators the total sum paid by them was less than 90 per cent. of the contract price. The letter referred to is not an architect's certificate, nor in the nature of such a certificate. Quite the contrary. *Village of Chester* v. *Leonard*, 68 Conn. 495 (37 Atl. 397). It was written November 26, 1910, a short time before the contractors quit. It reads:

"Enclosed you will find a certificate for the amount due the Faust-Scheel Company for work on your building. From this amount should be taken all money that has been paid them by you since the last certificate was issued, October 29th, and also the amount for the

enamel brick which you furnished as well as the freight on same. I tried to get the Glover Lumber Company this morning, but Mr. Glover is not there. However, the bookkeeper told me they had a note from the Faust-Scheel Company, but Mr. Glover went to Flint to try and get an indorsement on it, as I understood him. Under the circumstances, would it not be a good idea to have the Faust-Scheel Company give orders for the amounts due various parties so that you can pay them direct and know where the money goes."

It is said by counsel for plaintiffs that, under the rule we have heretofore indicated for construing the contract of the surety, slight deviations from the terms of the contract do not discharge the surety in the absence of prejudice to its rights; that, in view of the fact that 10 per cent. of what the contractors had earned was reserved and was applied by the owners to the payment of valid claims, no prejudice to the surety's interests is apparent. It is urged also, that, in any event, the provisions of the contract referred to are for the benefit of the owner. Concerning this last contention, we have heretofore made some observations not in harmony therewith. Conceding that the provision was material to the surety, and that it has not been observed, the question is whether the surety's undertaking is thereby avoided; it not appearing that it was damaged. It has been held (*City of New Haven* v. *Economizer Co.*, 79 Conn. 482 [65 Atl. 959]), that, where the contract stipulated that payments to the contractor should be made on the 15th of each month for 85 per cent. of labor and materials upon certificates delivered on or before the 5th of each month, mere deviations from these dates in making payments and giving certificates were technical and immaterial departures of which the surety could not take advantage. On the contrary, in *Queal & Co.* v. *Stradley*, 117 Iowa, 748 (90 N. W. 588), it was held that:

"The requirement of the contract that the money due

thereon be paid only upon receipted bills or waivers for labor and material was a very material one for the protection of the sureties, and a departure from that provision created a condition to which the sureties had not assented in the bond or elsewhere. The money thus paid to the contractor, although not in excess of the 85 per cent. provided for in the contract, may have been used for purposes not connected with the construction of the building in question. Many of the payments were also made without certificates from the architects, which was a violation of the terms of the bond."

In the latter case the rule applied is the strict rule that the surety may stand upon the letter of his contract. See, also, *Fidelity & Deposit Co.* v. *Agnew,* 152 Fed. 955 (82 C. C. A. 103). Both cases are illustrations of numerous decisions, in some of which the rule *strictissimi juris* is applied and in some refused. What the rule should be in a case, where it appeared that payments made to the contractors were in the nature of profits and retained by them, we need not decide. It does not appear that all money paid was not used to liquidate demands for which, if unliquidated, the appellant would be liable. We answer the question in the negative.

What has been said disposes of other contentions of the appellant and requires that the judgment should be affirmed.

BROOKE, C. J., and KUHN, STONE, BIRD, MOORE, and STEERE, JJ., concurred with OSTRANDER, J.

This case was originally assigned to the late Justice MCALVAY.