The WINSTON CORPORATION,
Plaintiff-Appellant,

v.

CONTINENTAL CASUALTY
COMPANY, Defend-
ant-Appellee.

No. 73–1886.

United States Court of Appeals,
Sixth Circuit.

Jan. 17, 1975.

John C. McDonald, Robert J. Sidman, Mayer, Tingley, Hurd & Emens, William A. Morse, Columbus, Ohio, for plaintiff-appellant.

John L. Miller, McNamara & McNamara, John J. Petro, Columbus, Ohio, for defendant-appellee.

Before WEICK and McCREE, Circuit Judges, and CONTIE,* District Judge.

McCREE, Circuit Judge.

This is an appeal from a judgment in a diversity action for defendant-appellee on a performance and payment bond executed by Continental Casualty Company, as surety, in favor of appellant, The Winston Corporation, as obligee. The parties agree that Georgia law applies.

The facts of the case are virtually undisputed. In 1967, Diversified Engineering and Sales Corporation (Diversified) agreed to build for The Winston Corporation (Winston) a nursing home at a cost of $752,874.00. The construction contract required Diversified to obtain a performance and payment bond from an acceptable bonding company. Diversified purchased a bond from Continental Casualty Company (Continental) for a premium of $6,444.00. A copy of the bond, drafted by Continental on its own printed form, was delivered to Winston on October 3, 1967.

The bond expressly incorporated the provisions and specifications of the construction contract and provided, *inter alia*:

NOW, THEREFORE, THE CONDITION OF THE ABOVE OBLIGATION IS SUCH, that if the above bounden Principal shall well and faithfully perform the things agreed by him to be performed, according to the terms, conditions, and requirements of the foregoing contract; and shall pay all persons who have furnished labor or material for use in or about the improvement; and shall indemnify and save harmless the Obligee, and its officers, agents and employees, from any and all claims for damages, costs, judgments, and other expenses, arising or growing out of this contract; then, this obligation shall be null and void,

otherwise, the same shall remain in full force and effect.

Continental issued the bond without reading the construction contract and never even requested a copy of it until approximately two and one-half years later. Continental did, however, investigate the financial condition of Diversified and its principal before it issued the bond. It learned that Diversified had comparatively thin assets, a not uncommon condition for some construction companies, but that Diversified's principal was financially stable. Before construction began several weeks later, however, Continental discovered that Diversified's principal was suffering a serious financial setback and that he would no longer be participating in the project. Continental did not object to his withdrawal, and accepted another officer of Diversified as a substitute, even though he had submitted to Continental financial statements overstating his own and Diversified's net worth.

Continental never communicated any of this unfavorable financial information to Winston.

On December 4, 1967, Winston obtained a construction loan for which it executed a $1,250,000.00 promissory note and security deed. On December 11, the construction lender, the permanent lender, and Winston agreed that the permanent lender would purchase the loan from the construction lender upon completion of the project.

On the next day, Winston instructed Diversified to begin construction in accordance with their contract which provided that the project be completed within 300 calendar days after commencement of construction.

Shortly thereafter, construction began with completion scheduled for mid-October 1968. Upon expiration of the 300 day period, however, the building was far from finished despite Winston's repeated exhortations. Continental watched closely the developments at the construction site and was fully aware of

* The Honorable Leroy J. Contie, Jr., Judge, United States District Court for the Northern District of Ohio, sitting by designation.

the construction delays and problems. In addition, Continental had initiated a lawsuit against Diversified in that same year for non-performance of another construction contract and eventually obtained a favorable judgment.

After the scheduled completion date had passed, Winston officials met with Diversified in January and again in April 1969. In April, the project was still not finished even though more than five months had elapsed since the scheduled completion date. Continental was asked on more than one occasion to attend these meetings convened to resolve construction delays and problems. The surety, however, refused to attend. During discovery proceedings, Winston learned that Continental, as early as April 1968, shortly after construction had begun, had discussed denying that the bond was still in force. These discussions were not communicated to Winston.

In early spring of 1969, Winston faced the following crisis: the construction loan was about to mature; the permanent loan commitment was about to expire; and no progress was being made on the project. Accordingly, on April 7, 1969, after an earlier meeting to which Continental had been invited but refused to attend, Winston and Diversified entered into a letter agreement designed to accelerate construction. This agreement, intended as an assignment of the construction contract, permitted Winston to take possession of the premises, to assume construction of the project, and to take an assignment of Diversified's subcontracts and other rights. It specifically contemplated, however, Diversified's continuing participation in the contract. Moreover, one of its provisions stated that the agreement "does not modify or change the existing bond on the project which exists for the owner's benefit." The agreement, considered to be the most efficacious method of completing construction at the lowest cost and with the least delay, was believed to be authorized by Contract Article 33 governing assignment.

On the same day, April 7, 1969, Diversified notified Continental by telephone of the letter agreement and mailed a copy of it. Within a few days, Winston took over construction of the nursing home, and it was completed in mid-October 1969, approximately twelve months after the scheduled completion date. Winston took possession of the premises and began nursing operations a month later.

In December 1969, Winston submitted a claim to Continental on the performance and payment bond. When Continental refused to honor the bond, Winston brought this action in United States District Court on June 18, 1970.

The amended complaint alleged that the performance and payment bond had been executed by Continental to guarantee performance of the construction contract between Winston and Diversified; that the construction contract required Diversified to furnish all labor and materials for the construction of a nursing home in Georgia in accordance with certain plans and specifications; that Diversified had failed to do so; and that Continental had failed to honor the bond it issued in connection with the project. It also alleged that Continental had acted tortiously toward Winston by failing to relay to Winston information it learned concerning Diversified's precarious financial condition.

In 1972, the case was tried before the district court sitting without a jury. Its decision was issued on March 2, 1973, and judgment was entered in favor of Continental. After a motion for reconsideration was denied, notice of appeal was filed on June 19, 1973.

In its opinion, the district court determined that Winston could not recover on the performance and payment bond because (1) the April 7 agreement was a novation of the construction contract that had the effect of discharging the surety in the absence of the surety's consent; and (2) the failure of Winston to give Continental seven days written notice under Article 22 before terminating the employment of the contractor re-

leased Continental from its obligations on the bond. In addition, the court determined that Winston could not recover damages on either a common law tort or contract theory.

On appeal, Winston contends that the district court erred in concluding that the April 1969 agreement was a novation that discharged Continental, and argues further that if it were a novation, Continental consented to it in advance and therefore is not discharged. It also argues that even if it were a novation to which Continental did not consent, Continental, as a compensated surety, is not discharged because the novation was not actually detrimental to its interests. Further, Winston contends that the district court erred in denying recovery to it because of failure to comply strictly with the notice provisions of Article 22 of the construction contract. Finally, it contends that the district court erred in holding that Winston did not have a valid claim against Continental on common law tort and contract theories.

An examination of the opinion filed by the district court, of the briefs and record filed in connection with the appeal, and of Georgia law, convinces us that whether the April 7 agreement is interpreted as an assignment or as a termination of the contract, it did not discharge the surety. We also determine that the failure of Winston to comply strictly with the notice provisions of Article 22 did not excuse Continental from its undertaking to indemnify Winston under the bond. Accordingly, we need not decide the other assignment of error.

█ Under Georgia law, a material change in the terms of a contract is considered a novation and discharges a surety. Brunswick Nursing & Convalescent Center, Inc. v. Great American Insurance Co., 308 F.Supp. 297, 299–300 (S.D.Ga. 1970); American Surety Co. of New York v. Garber, 114 Ga.App. 532, 151 S.E.2d 887 (1966).

In this case, the construction contract, which was expressly incorporated in the bond, permitted both an assignment[1] of the contract and its termination under specified circumstances. Article 22, "OWNER'S RIGHT TO TERMINATE CONTRACT," provided, in relevant part,

If the Contractor should . . . persistently or repeatedly refuse or should fail, except in cases for which extension of time is provided, to supply enough properly skilled workmen or proper materials, . . . or otherwise be guilty of a substantial violation of any provision of the Contract, then the Owner . . . may, without prejudice to any other right or remedy and after giving the Contractor, and his surety, if any, seven days written notice, terminate the employment of the Contractor and take possession of the premises and of all materials, tools and appliances thereon and finish the work by whatever method he may deem expedient.

█ By the very terms of the contract to which Continental agreed, Winston had an absolute right to terminate the employment of the contractor and to assume the construction of the home itself. Accordingly, even if the April 7 agreement be considered a termination of the contract, it was not a novation since it was contemplated by the terms of the contract. Instead, it was an implementation of one of the contract provisions. Winston, by the April 7 agreement, merely undertook to do that which Diversified had promised, but failed to do.

█ The next question is whether Continental was discharged from its obligation because Winston failed to give it written notice seven days in advance of taking over the construction. In deciding this question, we apply the surety law of the State of Georgia as expressed either by its legislature or by its highest court. Erie Railroad v. Tompkins, 304

1. The assignment article of the contract provides:

ASSIGNMENT
Neither party to the Contract shall assign the Contract or sublet it as a whole without the written consent of the other, nor shall the Contractor assign any moneys due or to become due to him hereunder, without the previous written consent of the Owner.

U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). And, in the absence of a dispositive statute or a controlling decision by the state's highest court, we apply what we determine to be the state law after giving proper regard to relevant precedents of other courts of the state. Commissioner v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

Historically, an alteration of the primary obligation owed to the obligee discharged the surety. Bethune v. Dozier, 10 Ga. 235, 238–239 (1851), 10 Williston, Contracts, § 1240 (rev.ed.1917). The obligation of a surety was considered *stricti juris,* and even a slight deviation from the contract terms discharged the surety. The results of applying this rule were often harsh and unjust, especially when compensated sureties were relieved of their obligations because of technical breaches of the assured contract. Consequently, most courts departed from the rule of *stricti juris* in cases in which a surety had been compensated for its undertaking and developed the rule that a compensated surety is discharged only if the change is material and causes some injury, loss, or prejudice to it. *See* Montpelier v. National Surety Co., 97 Vt. 111, 122 A. 484, 33 A.L.R. 489 (1923), School District v. Massachusetts Bonding & Ins. Co., 92 Kan. 53, 142 P. 1077 (1914), Bross v. McNicholas, 66 Or. 42, 133 P. 782 (1913), Annot., 127 A.L.R. 10, 62–63 (1940), Annot., 12 A.L.R. 382 (1921), Note, 33 Tulane L.Rev. 717 (1959).

Although most jurisdictions now differentiate between compensated and uncompensated sureties for the purpose of determining contractual liability, there is recent authority in Georgia that appears to support the application of the *stricti juris* rule even when the surety is compensated. Brunswick Nursing & Convalescent Center, Inc. v. Great American Surety Co., *supra,* Peara v. Atlanta Newspapers, Inc., 120 Ga.App. 163, 169 S.E.2d 670 (1969).

The Georgia Supreme Court has not, however, definitively determined whether the distinction between compensated and uncompensated sureties applies in Georgia. Appellant has cited only two cases decided by the Supreme Court of Georgia in which the question of discharge of a surety has been discussed, and appellee has cited none. Neither case is dispositive. Zellner v. Hall, 210 Ga. 504, 80 S.E.2d 787 (1954) and Alropa Corp. v. Snyder, 182 Ga. 305, 185 S.E. 352 (1936) stand only for the proposition that a surety is discharged by an act of his principal or obligee that increases its risk unless it consents to the novation. They do not hold that a compensated surety is discharged by a change in the contract that does not increase the risk it has assumed.

In other instances, although the Georgia Supreme Court has spoken in terms of *stricti juris* in considering the liability of sureties, it has refused to give effect to unreasonable terms in surety contracts and has applied equitable principles in order to achieve just results. Thus, in Waldon v. Maryland Casualty Co., 155 Ga. 76, 116 S.E. 828 (1923), the court considered the effect of the failure of the obligee to comply strictly with contract provisions for service of process on the surety in an action on the bond. The pertinent portion of the contract stated:

Provided, however, that this bond is executed upon the following express conditions, the performance of each of which shall be condition precedent to any right of recovery hereon, anything in the contract to the contrary notwithstanding . . . 2. That no claim, suit, or action by reason of any default shall be brought against the principal or surety after the 18th day of March, 1916, nor shall recovery be had for damages accruing after that date; that service of writ or process commencing any such suit or action shall be made on or before such date . . . . .

155 Ga. at 80, 116 S.E. at 830. Service of process on the surety was not perfected until March 30, 1916, although the suit was filed before March 18. The court refused to construe the contract

terms strictly and held that service on the surety company related back to the filing of the suit. It held that any other interpretation of the contract would empower court officers to prevent recovery by delaying service of process. Because the contract in *Waldon* stated that service of process before a certain date was a condition precedent to the surety's liability, the court's decision to hold the surety liable when the action was timely commenced evidences a policy of the Georgia Supreme Court to avoid an injustice that would result from giving effect to a technical breach of a contract of suretyship. And the Georgia Supreme Court applied equitable principles in an action against a surety who was not permitted to claim the rule of *stricti juris* when his own actions contributed to the default. Jones v. Hawkins, 60 Ga. 52 (1878).[2]

Since *Erie* directs our attention to the statutes of the state as well as its high court decisions, we consider 28A Georgia Code Annotated, section 103–202, which provides:

> Any change in the nature or terms of a contract is called a novation; such novation, without the consent of the surety, discharges him.

It is evident, however, that the Georgia legislature intended the sweeping provisions protecting sureties to apply only to uncompensated sureties. The very first section of the surety statute defines a contract of suretyship as

> . . . one whereby a person obligates himself to pay the debt of another in consideration of credit or indulgence, or other benefit given to his principal, the principal remaining bound therefor. It differs from a guaranty in this, that the consideration of the latter is a benefit flowing to the guarantor.

28A Ga. Code Ann. § 103–101.

The plain meaning of this section is that only uncompensated sureties were intended to benefit from this statutory protection and compensated sureties were to be treated as guarantors.

The statute has been so applied in cases where married women seek to bind their separate estates to secure the extension of credit to third persons. In Georgia, married women may not act as sureties and bind their separate estates but may act as guarantors. The determinative factor in deciding whether a married woman has agreed to act as a surety or as a guarantor is whether she has received "new, separate and independent" consideration for the undertaking. If she did not, she is a surety, for the purpose of the statute, and her separate estate is not bound by her undertaking. *See, e. g.*, Southern Land & Development Co. v. Silvers, 499 F.2d 967 (6th Cir. 1974), Wolkin v. National Acceptance Co., 222 Ga. 487, 150 S.E.2d 831 (1966). Nevertheless, a third person, not a married woman, who obligates himself to pay the seller of goods in consideration of credit extended to a purchaser has, in Georgia, uniformly been considered a guarantor even though he receives no independent consideration.

In cases other than those concerning the power of married women to bind their separate estates and concerning the extension of credit to the purchaser of goods, the line of demarcation between sureties, who are said to be favorites of the law, and guarantors, who are said not to be, is not clear despite the statutory definition of those terms. However, we observe that in none of the cases cited by the parties has a compensated surety been discharged because of the failure of its obligee to comply strictly with a provision of the assured agreement unless the departure from its terms increased the surety's risk or changed the contract to the surety's de-

---

2. In this case an attorney had acted as surety for his client and procured a discharge in bankruptcy. The attorney asserted that the bankruptcy adversely affected the risk he undertook. The court held: "Whilst there is nothing immoral in what [surety] did as counsel, yet he does not come into court in such manner as entitles him to claim *stricti juris* as his measure of right." 60 Ga. at 56.

triment. *See, e. g.*, Alropa Corp. v. Snyder, *supra*, Hill v. O'Neill, 101 Ga. 832, 28 S.E. 996 (Ga.1897), Peara v. Atlanta Newspapers, Inc., *supra*, Palmes v. Southern Mechanical Co., 117 Ga.App. 672, 161 S.E.2d 413 (1968), Mayor & Aldermen of the City of Savannah v. Glen Falls Insurance Co., 104 Ga.App. 879, 123 S.E.2d 293 (1961), *cf.* American Surety Co. of New York v. Garber, 114 Ga.App. 532, 151 S.E.2d 887 (1966).

■ From our review of the statutes and case law, we conclude, as many of the Georgia courts of appeals have, that the law of suretyship in Georgia is unsettled, and often contradictory. *E. g.*, General Finance Corp. of Atlanta, Northeast v. Welborn, 98 Ga.App. 280, 105 S.E.2d 386 (1958), Etheridge v. W. T. Rawleigh Co., 29 Ga.App. 698, 116 S.E. 903 (1923), A. B. Small Co. v. Claxton, 1 Ga.App. 83, 57 S.E. 977 (1907). Since there is no authoritative expression of Georgia law, we may exercise our judgment based upon applicable principles of state law, upon relevant decisions in other jurisdictions, and upon our own conceptions of sound and just rules. *E. g.*, Putnam v. Erie City Manufacturing Co., 338 F.2d 911 (5th Cir. 1964), New England Mutual Life Insurance Co. v. Mitchell, 118 F.2d 414 (4th Cir.) cert. denied, 314 U.S. 629, 62 S.Ct. 60, 86 L.Ed. 505 (1941).

We believe that the Georgia Supreme Court, if it were deciding this case, would follow recent authority and refuse to apply the outmoded *stricti juris* rule that some Georgia courts have stated is applicable to compensated sureties. Instead, we believe the supreme court would determine that appellant's failure to give seven days notice was an insubstantial breach in light of the circumstances of this case, and that it caused no prejudice or injury to the surety.

■■ Under modern American surety law, a mere technical breach of a surety contract, not resulting in damage or prejudice to the surety, will not release it from its obligations.[3] Montpelier v. National Surety Co., 97 Vt. 111, 122 A. 484, 33 A.L.R. 489 (1923), Doyle v. Faust, 187 Mich. 108, 153 N.W. 725 (1915), School District v. Massachusetts Bonding & Ins. Co., 92 Kan. 53, 142 P. 1077 (1914), Bross v. McNicholas, 66 Or. 42, 133 P. 782 (1913), Annot., 127 A.L.R. 10, 62–63 (1940), Annot., 12 A.L.R. 382 (1921), Simpson, Suretyship 111 (1950). This is the situation here. In the bond it executed for the benefit of Winston, Continental agreed, for a substantial consideration, that the bond would "remain in full force and effect" until the principal, Diversified,

> shall well and faithfully perform the things agreed by him to be performed, according to the terms, conditions, and requirements of the foregoing contract; and shall indemnify and save harmless the Obligee, and its officers, agents and employees, from any and all claims for damages, costs, judgments, and other expenses, arising or growing out of this contract . . .

Moreover, when Continental executed the bond, or shortly thereafter, it was aware of the precarious financial condition of Diversified and of its failure to perform another construction contract to which Continental had acted as surety. Continental kept itself informed of the progress of construction of the nursing home and was aware of the delays and difficulties that finally led to the April 7 agreement. · Continental was invited to discuss construction problems with Di-

---

**3.** We observe here that Louisiana has surety statutes similar to those of Georgia, and Louisiana courts have given literal effect to the statutes' terms. Art. 2198 of the Louisiana Civil Code provides that "[t]he novation that takes place with regard to the principal debtor, discharges the surety," and is similar to section 103–202 of the Georgia Code. Art. 3061 of the Louisiana Civil Code provides that any act of the obligee which is prejudi-

cial to the rights of the surety discharges it. This provision is similar to section 103–203 of the Georgia Code. Originally, Louisiana courts made no distinction between accommodation sureties and compensated sureties, .but a more realistic approach was taken in Texas & Pacific R.R. v. United States Fiduciary & Guaranty Co., 16 So.2d 671 (La.App. 1944), where strict construction of surety contracts was limited to accommodation sureties.

versified and Winston several times but declined to attend any meeting including the one on April 7.

Had the April 7 agreement provided that it would not become effective until seven days after receipt by Continental, there is no doubt that Continental would not have been discharged. We do not believe that this insignificant distinction, in light of Continental's knowledge of the construction problems and its rejection of Winston's repeated invitations to discuss them, should require a different result.

Reversed and remanded for entry of judgment for appellant.