CLARK v. GOLDIE.

1. EVIDENCE—MASTER AND SERVANT—NEGLIGENCE—ADMISSIONS.
   Evidence that defendant's superintendent stated before the
   coroner's jury at an inquest that defendant had intended
   to replace the pulley which burst and killed plaintiff's
   intestate, but thought they would let it run awhile, was
   not admissible as substantive proof of his knowledge that
   the machinery was defective.

2. MASTER AND SERVANT — NEGLIGENCE — FELLOW-SERVANTS — DE-
   FECTIVE MACHINERY—DEATH.
   In an action for the wrongful death of defendant's servant,.
   testimony that a fellow-servant pried on and strained a
   pulley, weakening it, was not a proper basis of liability,.
   since it was the act of a fellow-servant not shown to have
   been brought to defendant's notice.

3. SAME—INCOMPETENCY OF EMPLOYEE—FELLOW-SERVANTS.
   And it was not evidence of the incompetency of defend-
   ant's foreman that he had never observed the peculiar
   sound emitted by a cracked iron pulley, which certain
   witnesses testified was always recognizable when a de-
   fective pulley was running.[1]

Error to Bay; Collins, J.   Submitted June 11, 1912.
(Docket No. 30.)   Decided December 20, 1913.

Case by Charles Clark, administrator of the estate
of William F. Clark, deceased, against William Goldie
and William Goldie, Jr., copartners, for the unlawful
killing of deceased.   Judgment for plaintiff, and de-
fendants bring error.   Reversed; new trial denied.

*Cooley & Hewitt,* for appellants.

*Hall, De Foe & Henry,* for appellee.

[1] On the question of the master's constructive knowledge as
to capacity of servants as element of liability to injured servant,
see note in 41 L. R. A. 46, 53.

McALVAY, J. This case is before this court for the review of a judgment obtained by plaintiff against defendants upon the second trial had after its reversal in this court. The case is reported in 146 Mich., at page 303 (109 N. W. 1044). That opinion, to which reference is had, contains a full statement of the facts in the case, which need not be repeated. The case was reversed because the evidence, in the opinion of the court, was not sufficient to show that defendants had knowledge of a defective condition of the pulley and insufficient to show that they were negligent in failing to inspect the pulley in question more frequently than the record shows. Appellants contend that the present record presents no other or different case than that examined and passed upon when the case was first before this court. The record of the testimony upon the former trial was contained in about 100 pages. In the present record there are over 300 pages. The nature of the case presented when first before this court was of a character which required an analysis of all the evidence and the determination whether it was sufficient to show liability on the part of defendants, and in discussing and analyzing such evidence it clearly appears from the opinion wherein the court considered that no liability on account of negligence on the part of defendants had been shown. It is evident from the record now presented to the court that such critical consideration of the evidence in the case then made has since that time been given first consideration by plaintiff. This is frankly acknowledged in his present brief, which states, "The present record meets and overcomes each point and suggestion of the opinion." And following such statement says that in this record will be found the following evidence:

"(1) That defendants, or their conceded *alter ego*, Kennedy, the superintendent, prior to the bursting of

the pulley, had notice and knowledge that it was defective and should not have been used.

"(2) That the pulley was on the shaft at the time Drake examined it the morning following the accident when he saw the sledge marks on the hub, and had not been removed as inferred by the court in the opinion.

"(3) That the pulley as employed was not only exposed to great strain, but was frequently subjected to undue risk of cracking and checking, both in its rim and spokes, by the practice of employees placing one end of a plank 12 feet long, 6 inches wide, and $1\frac{1}{4}$ inches thick under the surface of the rim of the pulley and by means of a fulcrum beneath the plank exerting a force equivalent to three tons upon the pulley to force it up so that it could be made to carry and maintain the under part of the belt in line with the lower of the two corner pulleys around which it passed.

"(4) That inspection of such pulleys is had not alone for the purpose of keeping them in good working order, but as well to keep and maintain them in a condition reasonably fit and safe for use.

"(5) That the pulley was not an idle one placed underneath the belt merely to keep it from sagging and to idle it along, but in fact was a work pulley, exposed to great strain, and in consequence of the manner in which it was forced and maintained in place and the office which it filled, one that called for oversight and inspection, not merely to keep it in good working order but to determine whether the strain of such exposure and manner of use weakened it and rendered it unfit to perform its office.

"The foregoing cover all subjects contained in the former opinion, and they will each be considered in the order most conformable to the brief of defendants."

Appellants in presenting their contentions discuss first the proposition that the present record does not disclose evidence of defendants' negligence, and urge that under the undisputed testimony—

"The pulley in question was suitable for the work required and was sound when placed in the sash

frame by Drake before the mill commenced operation January 28, 1903, and was in like condition two or three weeks later when placed upon the smaller shaft; the iron boxes or bearings at each end of which being bolted to stationary upright posts. It was thoroughly examined and tested on each occasion."

They also contend that the record shows it was examined by Mr. Drake not long before the accident.

The first claim on the part of plaintiff wherein this record differs from the former is that defendants, or their superintendent, Kennedy, had notice and knowledge prior to the accident that the pulley was defective and not fit for use. The testimony upon which this claim is founded was allowed over the objection of defendants, first, upon cross-examination of Mr. Kennedy relative to a statement made by him after the accident at the time of the coroner's inquest in presence of some of the jury, which statement he positively denied, and, later, the admission, over like objection, of the testimony of Mr. Morrow, one of the jury, as to what was said by Mr. Kennedy.

The objections of defendants' counsel to receiving this testimony covered the grounds both as to the question of collateral impeachment and that it could not be used as affirmative proof of his knowledge or the knowledge of defendants. There is a dispute between counsel as to the ground upon which this testimony was received and what position counsel and court on the trial and counsel upon hearing in this court have taken in regard to its use. Counsel for plaintiff contend that it was only received as impeaching testimony. Counsel for defendants urge that both on the trial and in this court it was and is used as affirmative proof of the fact. This was the only testimony admitted in the case which indicates, or from which it is claimed, Superintendent Kennedy had any knowledge before the accident that this pulley was defective. The contention of defendants' counsel upon

this proposition is entirely supported by the record and plaintiff's brief. In the brief, in plaintiff's amended statement of facts, appears the following:

"On the present trial there was evidence that the superintendent, one Kennedy, had notice or knowledge of the defective condition prior to the injury."

Later in the brief, in the argument supporting plaintiff's contention, appears the following:

"(5) There was evidence that Superintendent Kennedy had notice and knowledge prior to the accident that the pulley was not a suitable one for use."

The trial court in his charge to the jury said:

"* * * And if you find that defendants were negligent in that regard and did in fact employ a pulley which was so defective, and they, or their superintendent, Mr. Kennedy, knew of such defect, or it had been continued such a length of time before said injuries that in the ordinary oversight and supervision of the mill they should have discovered it. * * *"

And again later in the charge, as follows:

"The defendants are charged with all knowledge that their superintendent, Kennedy, intrusted with the duty of oversight and supervision had, if any, of the condition of the pulley which exploded, prior to the time thereof."

This charge was given after the following request to charge had been presented on behalf of defendants and denied:

"I charge you that the testimony of witness Morrow regarding certain statements made by Mr. Kennedy, subsequent to the accident, concerning Mr. Kennedy's knowledge of the prior condition of the pulley, are struck from the record, and you are not to consider said statements in reaching your verdict."

Errors are assigned on the part of defendants upon the admission of the testimony of the statements of

Mr. Kennedy after the accident, and upon the portions of the charge quoted.

The weight of the authorities is against the proposition that testimony of the character of that we are discussing can be received as substantive evidence. This is admitted by counsel for plaintiff in their brief, where it is also contended, notwithstanding the evidence of the record to the contrary, as already pointed out from the brief and the charge of the court, that this testimony was offered and received for the sole purpose of impeachment. As already stated, it was received by the court and allowed to be considered by the jury as substantive evidence of the knowledge of Superintendent Kennedy. In a case cited by plaintiff, this court, where the question was considered at length, in stating that such testimony is allowable, "being in the nature of collateral impeachment," said:

"It could not be used for any other purpose, and was no evidence of the negligence of the defendant." *Lepard* v. *Railroad Co.*, 166 Mich. 373, at page 382 (130 N. W. 668, 40 L. R. A. 1105).

The court erred in allowing this testimony to be considered by the jury as substantive evidence of the knowledge of Kennedy.

The next contention of plaintiff is that the hub of the pulley was on the shaft at the time witness Drake examined it when he saw the hammer marks on it. In the former record, witness Drake, the millwright who installed the machinery in this mill, including this pulley, testified that after the accident he went to examine it to ascertain why it flew to pieces; that it had been taken off from the shaft upon which it was when he installed it; and that there were fresh hammer marks on the hub. The court inferred from his testimony that the hub was not on the shaft when he examined it. As a witness in the present record,

he states that his impression is that the hub was on the shaft. This record shows that after Drake left defendants' employment, some time in January, 1903, this pulley and shaft was taken out of the movable sash or frame in which he installed it. The pulley was then taken off from the old shaft and put on to another shaft somewhat smaller, upon which it was babbited fast and then was hung between two solid posts at the proper height with five-inch boxes at each end of the shaft countersunk into the posts, where it remained until March 6th following, the date of the accident. The only evidence as to the removal of this pulley from the old shaft is given by one of the men who assisted, who testified that it came off easily without hammering. The evidence is clear that it went onto the new shaft readily, because it was smaller, and there is no evidence in the case tending to show that before the accident there were any hammer marks upon this hub. Therefore it follows that, as far as the hammer marks are concerned, the present record shows affirmatively that none were upon the hub before the accident.

Defendants upon this question requested the court to charge as follows:

"There is no competent testimony in this case which tends to prove that the so-called sledge or hammer marks on the hub of the pulley were made before the accident, and I charge you not to consider such marks as a cause of the bursting of the pulley."

The court was in error in refusing to give this request.

The plaintiff further contends that the present record differs from the former in showing that the pulley was exposed to great strain and subjected to undue risk of cracking by the employees putting under its rim a heavy 12-foot plank and by means of a fulcrum under the lower end putting a strain of three tons under it to force it up to carry the belt and main-

tain the under part of it in line with the lower one of the corner pulleys around which it passed; that this was not an idler pulley; but that it was a tightener. The record is undisputed that this pulley was installed but for one purpose, and that was to keep the belt which ran over it upon a line with the lower corner pulley. It was formerly set in a frame which would work up and down. Later, it was changed and put upon a rigid shaft set in countersunk boxes on upright posts, where it continued until the accident. A witness testified on the last trial that on several occasions, the last time the night before the accident, he, with two other employees, strained this pulley up higher with the heavy plank under its rim.

It is apparent to one at all acquainted with mills and machinery of this character, and from the evidence as to how this pulley and its shaft were affixed to the posts at the time of the accident, that this witness was testifying to a physical impossibility. However, taking this testimony as true, whatever was done was the act of a fellow-servant in no way brought to the knowledge of the defendants and for whose negligence they would not be liable. It was one of the risks assumed by the plaintiff's decedent.

This pulley was called by some of the witnesses a "tightener." It carried the belt for the purpose of keeping it running on the corner pulley. This belt simply ran over the pulley in question, and whatever strain there was upon it came from this belt. It was a rubber belt which drove two saws, and which on account of stretching was occasionally cut and laced to take out the slack. The record does not show that this pulley was carrying what is known as a "load." There is a great deal of testimony introduced in the case which is claimed on the part of plaintiff to bear upon the question of the strain upon this pulley which, when carefully considered, refers to the load upon the drive pulley which operated the saws and the

kind and weight of belts best adapted for such purposes, tending to show that a belt similar in width to the one in question (the thickness and character of which was not identified) would slip in attempting to do such work; in other words, that this belt was overtaxed.

The negligence charged in the declaration is that defendants negligently used and operated a cracked and defective pulley without due and proper inspection by competent and skilled employees to see that it was reasonably safe and proper for use for the purpose for which it was designed, and there is no allegation of negligence that the accident was caused by an overtaxed belt. The evidence relative to overtaxing this belt tends to show that the heavier it was loaded the more slack it would give, and consequently less pressure upon the pulley in question.

It is urged that this record shows that the foreman in the shop was incompetent for the reason that he had never observed the peculiar noise given out by a cracked iron pulley, which several witnesses testified was always recognizable when such a defective pulley was running. This man had never heard such a noise, which seems to be the foundation of the argument upon which his incompetency is claimed. All of the witnesses on both sides, including the foreman, who testified upon this subject and who were employed in this mill at the time and before the accident, say that they never heard it give forth the sound which comes from a defective and cracked pulley, even up to the time of the accident, and all of them, except the foreman, say that that is one of the best methods of detecting such defects in a pulley, all of which tends to show that defendants had no notice of the defective condition of this pulley, if such existed, before its collapse, and does not tend to show the incompetency of the foreman, but by a fair inference

that he had never been employed in a mill where cracked pulleys were operated.

Careful examination has been given to this entire record, particularly wherein it is claimed to differ from the former one, and while it is three times as bulky as when the case was formerly considered, we do not find in it more frequent inspections are customarily made by ordinarily prudent employers and we agree with the appellants that, upon the questions which are determinative of the case, this record presents no other or different case for consideration than when formerly considered, except as herein otherwise expressed upon the admission of evidence and the charge of the court. The former decision is therefore followed. *Hall* v. *Murdock*, 119 Mich. 389 (78 N. W. 329).

The judgment of the circuit court is reversed, and in view of the fact that there have already been three trials, and there is no probability that any other or different case can be presented, we are constrained to hold that no new trial will be granted.

STEERE, C. J., and MOORE, BROOKE, STONE, OSTRANDER and BIRD, JJ., concurred.