**SOUTHERN SURETY CO. v. NALLE & CO. et al.** (No. 6223.)

(Court of Civil Appeals of Texas. Austin. May 16, 1921.)

**1. Constitutional law ⬉276—Statutory provision that change in plan of construction shall not affect liability on contractor's bond held unconstitutional.**

Rev. St. art. 5623a, as added by Laws 1915, c. 143, § 2 (Vernon's Ann. Civ. St. Supp. 1918, art. 5623a), in so far as it provides that no change or alteration in the plans, building construction, or method of payment shall affect the liability under a contractor's bond, is unconstitutional.

**2. Principal and surety ⬉100(4)—Test stated as to whether modifications affect liability under contractor's bond reserving right to modify.**

In determining whether changes in the plans or construction affect the liability under a contractor's bond which referred to and made a part of its plans and specifications reserving to the owners the right to alter or modify the plans and specifications, the test is whether the changes "alter or modify the plans and specifications" of the building contracted to be erected, or do they amount to a contract for a different building?

**3. Principal and surety ⬉100(4) — Change from three-story to four-story building may release surety under contractor's bond reserving right to "alter or modify plans and specifications."**

In an action on a contractor's bond reserving the right to "alter or modify the plans and specifications," where it appeared that the original contract provided for a three-story hotel, but the plans were subsequently changed so as to provide for a four-story building, held, that such change constituted such a departure from the plans and specifications as to call for a different building, and therefore released the surety, in the absence of ratification.

**4. Principal and surety ⬉128(1)—Change in plans ratified by surety will not release him.**

Where the surety under a contractor's bond consents to, or ratifies, a change in plans, its receipt of additional pay by reason of such change is proof of such ratification or of having consented to the change in advance.

**5. Principal and surety ⬉161—Evidence sustaining finding that surety had received additional compensation on account of alterations in plans.**

In an action on a contractor's bond, wherein it appeared that the plans, originally providing for a three-story hotel building, were modified so as to provide for a four-story building, evidence held to sustain a finding that the surety had received additional pay on account of such alterations which amounted to a ratification thereof.

**6. Evidence ⬉242(2)—Statement of agent of limited authority not part of res gestæ is hearsay.**

The statement of an agent of limited authority not a part of the res gestæ is hearsay and, if objected to, should not be admitted.

**7. Trial ⬉105(2) — Hearsay testimony not objected to is evidence.**

Hearsay testimony, if not objected to, is evidence to be considered by the court or jury for what they may deem it to be worth.

**8. Trial ⬉105(2) — Failure to object to evidence of inferior grade a waiver of best evidence.**

A party may waive production of the best evidence by failing to object to that of an inferior grade.

**9. Evidence ⬉244(8) — Testimony by surety company's agent held competent as admission as against objection that it was hearsay.**

In an action on a contractor's bond, where the defense of alterations in the plans was interposed, evidence by the architect that the general agent of defendant surety company told them defendant had received additional pay because of the alterations in the plans *held* admissible, since defendant was a corporation and could only speak through its agents.

Brady, J., dissenting.

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Action by Nalle & Co. and others against the Southern Surety Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

Barrett, Eskridge & Barrett, of San Antonio, and Hart & Patterson, of Austin, for appellant.

Brooks, Hart & Woodward, W. A. Barlow, Samuel B. Dickens, and Fiset & Shelley, all of Austin, Mantor & Briggs, Critz, Lawhon & McNair, and S. I. Reinhardt, all of Taylor, Holloway & Holloway, of Dallas, and W. D. Caldwell, of Fort Worth, for appellees.

On Motion for Rehearing.

JENKINS, J. As the Supreme Court, since our original opinion herein was written, has held that Rev. St. art. 5623a, as added by Laws 1915, c. 143, § 2 (Vernon's Ann. Civ. St. Supp. 1918, art. 5623a), is unconstitutional, we withdraw that opinion, and substitute the opinion herein for same, and also for our opinion on rehearing, which will be incorporated herein.

Findings of Fact.

On March 23, 1917, Howard Bland, T. W. Marse, and A. J. Zilker, hereinafter called the "owners," entered into a contract with John W. Hood, John W. Hood, Jr., F. J. Strassel, and F. Greenwell, composing the Capital City Building Company, hereinafter

referred to as the contractors, for the erection of a three-story fireproof hotel building, on certain lots in the town of Taylor, Williamson county, in accordance with plans and specifications drawn by Henry T. Phelps, architect, for the sum of $47,825. The contractors were to provide and pay for all material and work done, and complete the building in 125 days. Payments to the amount of 85 per cent. of the work done and material placed on the ground were to be made on the 1st and 15th days of each month, as the work progressed.

Of even date with the contractor, the contractors executed to the owners a bond, in the sum of $23,912.50, with the Southern Surety Company, hereinafter referred to as the "surety company," as surety, conditioned for the faithful performance of the contract, and specially that those who furnish material for or performed labor thereon should be paid for same, and might bring suit thereon as though specially mentioned therein. F. M. Coleman, of San Antonio, was the general agent of the surety company. The contractors entered at once upon the performance of their contract.

On May 10, 1917, the owners formed a corporation, under the name of the Blazilmar Hotel Company, hereinafter called the "hotel company," and subscribed for all of the stock of said hotel company, and thereafter remained the sole owners of such stock.

On the 10th day of May, 1917, the owners conveyed the lots upon which the hotel was to be built, and the contract for building the same, to the hotel company. On August 3, 1917, the hotel company entered into a contract with the contractors wherein it was agreed that they should build a fourth story to the hotel, and receive for the walls thereof $8,211.55, with the option of the hotel company to have the same finished in accordance with the specifications for the third story; for which, if so finished, the contractors were to be paid the further sum of $6,740.45. This contract declared that it was a part of the original contract, and the work was to be done as therein provided, and the time for the completion of the building was extended 45 days.

The surety company had no knowledge of the execution of the contract for the fourth story at the time of its execution. It did, however, learn that a fourth story was being added, and received additional pay, by reason of the increased cost of the fourth story.

On or about the ——— day of ———, 1917, the contractors assigned to the surety company all funds and estimates due or to become due for work done or material furnished, or to be furnished or done in the performance of their contract; and on April 20, 1917, the contractors and the surety company notified the owners of such assignment, and that thereafter all money due on said contract should be paid to the surety company, which was done, including work and material for the fourth story.

The contractors abandoned work on the hotel, and the same was finished by the hotel company at a loss of $1,343.69.

The following parties intervened in this cause, and there was due them by the contractors, at the time of the trial hereof, the amounts set opposite their respective names, to wit: The Blazilmar Hotel Company, $1,343.69; Nalle & Co., $5,107.25; James A. Thompson, $2,954.62; F. B. Seward, $239.13; Fairchild Lumber Company, $454.31; Prewitt Hardware Company, $345.60; Elgin Standard Brick Company, $518; J. Desco & Son, $1,499.85; Torbett & Germond Company, $410.06; C. M. Gossett, $464.33; K. J. Peterson, $48.10; Federal Glass & Paint Company, $828.15; Mosher Manufacturing Company, $350; Southern Architectural Cement Stone Company, $165; Austin Builders Supply Company, $160.85. For which sums the court rendered judgment against the contractors, in favor of said respective parties. Judgment was also rendered in favor of said parties for said respective amounts against the surety company.

The case was tried before the court without a jury. The court filed findings of fact and conclusions of law.

## Opinion.

[1] On authority of Williams v. Baldwin, 228 S. W. 557, not yet officially published, we sustain appellant's assignments to the effect that the following portion of the Act of March 31, 1915, art. 5623a, is unconstitutional, to wit:

"No change or alteration in the plans, building, construction or method of payment shall in any way avoid or affect the liability on said bond, and the sureties on said bond shall be limited to such defenses only as the principal on said bond could make." R. S. art. 5623a.

The plans and specifications, which are referred to in the contract and made a part thereof, contain the following clause:

"The owners reserve the right, by conferring with the superintending architect, to alter or modify the plans and this specification in any particular, and the architect shall be at liberty to make any deviation in the construction, detail or execution without in either case invalidating or rendering void the contract, and in case any such alteration shall increase or diminish the cost of doing the work, the amount to be allowed to the contractor or owner shall be such as may be equitable and just, and be determined by the architect."

[2] It has long been customary to insert similar provisions in builder's contracts. This, in part at least, has been occasioned by the rule of strictissimi juris, adopted by courts in reference to sureties, whereby the surety was released if "any" change was

made in the contract, though the same may have been immaterial and in nowise to his detriment. By a provision in the contract similar to that above set out, the surety agrees in advance that "some" changes may be made in the contract. What changes? Not necessarily immaterial ones. They might be very material without avoiding the contract, as for instance in the cost of construction. Stocking v. Fouts (Wash.) 169 Pac. 595, in which the increase in the cost was 20 per cent., though, as said in Doyle v. Faust, 187 Mich. 108, 153 N. W. 725, "there is a * * * limit beyond which, if alterations are made, the surety will be released." The question in all such cases is: What alterations were in contemplation of the parties, as evidenced by the language used in the contract, read in the light of what changes are frequently found to be desirable during the construction of buildings?

We think the test is: Do the changes "alter or modify the plans and specifications" of the building contracted to be erected, or do they amount to a contract for a different building? As has been said: Do the changes destroy the identity of the building?

It was held in the following cases, in which the contracts provide for changes substantially as in the instant case, that the changes did not amount to a new contract, nor release the surety: Dorsey v. McGee, 30 Neb. 657, 46 N. W. 1018 (the change was an addition of a stairway, a change in the character of the hardware, and the location of the cistern); Stocking v. Fouts, supra (the change was in the interior finish); Milavetz v. Oberg, 138 Minn. 215, 164 N. W. 912 (the contract required the changes to be ordered in writing; they were ordered orally); Doyle v. Faust, supra (the change was in the partition walls, windows, and chimney). In Stocking v. Fouts, supra, the court said:

"There was no change in the outward appearance and design of the building, its size, main walls, foundations or floors."

In Doyle v. Faust, supra, it is said: "There was no change in the character or exterior dimensions of the building."

In the following cases it was held that the changes released the surety: House v. Surety Co., 21 Tex. Civ. App. 590, 54 S. W. 303 (the change was from a three to a four story building); Miller v. Ice Co., 66 Ark. 287, 50 S. W. 508 (the change was from a one-story to a two-story building); Rhodes v. Clute, 17 Utah, 137, 53 Pac. 990 (the change was from a frame to a brick building, nearly doubling the cost); Sweatt v. Bonne, 60 Wash. 18, 110 Pac. 617 (a two-story building and a cellar were added); Contracting Co. v. Hudson River Co., 192 N. Y. 209, 84 N. E. 965 (the change was from a masonry to an earth dam with a masonry core).

In House v. Surety Co., supra, the court said:

"The identity of the building was destroyed."

In Rhodes v. Clute, supra, the court said:

They (the changes) were so variant, "both in price and construction, as to amount to an abandonment of the contract, and the creation of a new one."

[3] Many other cases in point might be cited, but these are sufficient to show the correctness of the test hereinbefore stated. Applying this test to the instant case, we do not think that a four-story building is a three-story building, with alterations and modifications in its plans and specifications, but that it is such a departure from the plans and specifications as to constitute it a different building.

We are confirmed in this view by the fact that under the provision for changes, as herein set out, the owner could make the same without the consent of the contractor. Does this mean that the owner could compel the contractor to erect one or more additional stories, without the contractor having any voice as to the price to be paid for same? We think not. And if not, there was a limitation contemplated as to what changes could be made. This limitation we think was changes in the building described in the plans and specifications, and not a change to different building.

[4] However, if the appellant consented to or ratified such change, it is not released. If it received additional pay by reason of such change, this is proof, either that it consented to such change in advance, or ratified the same.

[5] The court found specifically that appellant received pay, by reason of the increased cost incurred in the erection of the fourth story. This finding is binding on us, unless it is unsupported by the testimony. In support of this finding, the following facts appear of record:

F. M. Coleman was the general manager in Texas for appellant, and as such signed the bond herein sued on. He lived in the same city (San Antonio) with Hood, the contractor in charge of the work. He testified that their relations were close and confidential. He was informed by Hood of the contemplated change in the contract before the same was made. He knew of it after it was made, and never at any time objected thereto. Under the assignment of the contract to appellant, Coleman had the right to receive and disburse the payments made by the owners after the change in the contract, if he had agreed to such change; otherwise he had no such right. He did receive and disburse such payments, on the estimates of the architect, which showed upon their face that they were for a four-story building.

The architect, Phelps, testified positively that Coleman told him that appellant received additional pay by reason of the addi-

tion of the fourth story. This, according to Phelps, was not a casual remark which might not have been understood or correctly remembered by the witness, but was stated in a conversation when the building was in course of construction, and when Coleman was discussing the change from a three to a four story building, and the custom of bonding companies in such cases. Coleman was equally positive in his denial of having made such statement, and denied, as did also Hood, that such additional payment had been made. This raised an issue of fact to be decided by the court. The court decided it in favor of appellee.

Appellant contends that the statement of Coleman, that he received pay by reason of the addition of the fourth story, cannot be considered as legal evidence, for the reason that it was hearsay.

[6-8] It is true that the statement of an agent of limited authority, not a part of the res gestæ, is hearsay, and if objected to should not be admitted. It is also true that hearsay testimony, if not objected to, is evidence to be considered by the court or jury for what they may deem the same to be worth. In this, as in all other cases, the jury, or the court sitting as a jury, are the exclusive judges of the weight to be given to the evidence. Hearsay and secondary evidence are excluded, when seasonably objected to, not because they do not tend to prove the fact to which they relate, but because they presuppose the existence of better evidence. A party may, however, waive the production of the best evidence, by failing to object to that of an inferior grade. Schlemmer v. Ry. Co., 205 U. S. 9, 27 Sup. Ct. 407, 51 L. Ed. 683; Damon v. Carrol, 163 Mass. 404, 40 N. E. 185; Yeager v. Wright, 112 Ind. 230, 13 N. E. 709, 710; State v. Cranney, 30 Wash. 594, 71 Pac. 50–53; Riehl v. Evansville Foundry Ass'n, 104 Ind. 70, 3 N. E. 635; Stern v. Freeman, 4 Metc. (Ky.) 315; Langworthy v. Coleman, 18 Nev. 440, 5 Pac. 67.

The same is true as to the testimony of a witness disqualified by reason of interest. Heely v. Barnes, 4 Denio (N. Y.) 73, 74; Donelson v. Taylor, 8 Pick. (Mass.) 391.

In the instant case, no objection was made to the testimony of the witness Phelps.

In Henry v. Phillips, 105 Tex. 466, 151 S. W. 533, acts and declarations of Mr. Patillo, deceased, were proven without objection, which tended to show that in executing and delivering a deed to the land in controversy he did not intend thereby to convey title to the grantees. The court said:

"For this purpose it was not admissible, being hearsay evidence and in disparagement of the grantor's deed duly executed."

The fact that such testimony was hearsay added nothing to the fact stated by the court that "such incompetent testimony can never form the basis of a finding of facts." The same result would have followed had Patillo been present and testified, without objection, that he did not intend to convey title to the grantees. Public policy will not permit a grantor to say that he had a secret mental reservation contrary to the express terms of his deed, and should he so testify, without objection, such testimony would be no basis for a verdict or judgment. This case is not authority against the proposition that hearsay is competent evidence, if not objected to, as is held by the authorities above cited.

[9] We are also of the opinion that the testimony of Phelps would have been admissible even had it been objected to, for the reason that appellant is a corporation, and can speak only through its agents. Coleman was its general agent in Texas. The statement about which Phelps testified was made while the business of which he had control for appellant, namely, the erection of the building, was being transacted. We think, under the circumstances, he was the alter ego of appellant, and that his admission was its admission.

For the reason that appellant consented to or ratified the change from a three-story to a four-story building, by receiving pay for the increased risk, the judgment of the trial court is affirmed.

Motion overruled.

KEY, C. J. I concur in the conclusions announced by Mr. Justice JENKINS in the foregoing opinion, but as I did not concur in the former holding of this court that article 5623a of the Revised Statutes is constitutional, and wrote a dissenting opinion upon that subject, that opinion is not withdrawn.

KEY, C. J. When this case was originally decided by this court, the writer had it noted that he dissented from so much of the majority opinion as held that the provision of the statute, copied in the majority opinion and regulating the liability of sureties upon a contractor's bond, is constitutional. He concurs with Mr. Justice JENKINS in holding that the motion for a rehearing should be granted, and the judgment of the court below affirmed, for the reasons stated in his opinion this day filed. This renders it unnecessary to pass upon the constitutionality of the statute referred to in the original opinion; but, inasmuch as Mr. Justice JENKINS in his opinion on motion for rehearing reiterates the holding that the statute is constitutional, I deem it proper to briefly state some of my reasons for dissenting from that view.

It is well settled by the authorities that in a controversy between citizens of the same state, if a statute is unconstitutional, it cannot, without the consent of the parties, be read into the contract, nor given any effect whatever in determining the rights of the parties; and therefore, if this statute is vio-

lative of our federal or state Constitution, then it is not to be read into nor treated as a part of the contract which the surety company entered into when it became surety for the contractors.

With this preliminary statement, I will proceed to briefly state my views concerning the constitutionality of that statute.

It is conceded in the majority opinion that if, by enacting the statute under consideration, the Legislature meant that a surety would be bound on his bond, though the owner and the contractor should so change the contract as to destroy the identity of the building and make it essentially a different one from that contemplated by the contract, for the performance of which the surety bound himself, the act would be unconstitutional as an undue restriction on the freedom of contract. In that pronouncement I fully concur, and as we do not differ upon that subject no authorities will be cited in support of that proposition.

The majority opinion holds that such is not a proper construction of the statute, but that it was intended to apply to only such changes as are frequently found desirable during the construction of a building, and which do not change its essential character, nor make the contract as changed a radically different contract from the one on which the bondsmen became surety.

The language of the statute is as broad and comprehensive in reference to the liability of sureties as it was possible to make it. It not only declares that no change or alteration in the plans, building, construction, or method of payment shall in any way avoid or affect the liability on the bond, but it adds, "and the sureties on said bond shall be limited to such defenses only as the principals on said bond could make." In other words, if the Legislature had the power so to do, they have rendered it impossible for any one signing such bond to limit his liability to that of surety, and have, in effect, declared that he shall be a principal. The language "no change or alteration in the plans" certainly includes the addition of another story to the building, which is the change that was made in this case; and it seems to me that it is almost equivalent to judicial legislation for the courts to say that such broad and comprehensive language in the statute should be given a restricted meaning, and held not to apply to the change that was made in this case.

In holding that the particular provision of the statute regulating the liability of sureties is unconstitutional, I do not intend to declare the entire act void. That portion of the statute can be eliminated, and a valid law remain, regulating the rights of owners, contractors, materialmen, and laborers.

BRADY, J. (dissenting). The instances have been rare in which I have felt compelled to disagree with my Associates, but in this case I consider it my imperative duty to do so. Ordinarily, I should be content to merely register my formal dissent, but the decision impresses me as being so destructive of the fundamental law of agency, and such an undue regard for the findings of a trial court, as to justify me in writing at length my views.

In the original opinion, while differing upon the question of the constitutionality of the statute, this court unanimously held that there had been such a change in the contract to which appellant bound itself as surety as released it from liability. It was further held that the facts in the case did not raise any issue of estoppel in pais, and it was expressly found by this court that the finding of the trial court, to the effect that the surety received pay on the second contract, was not supported by the evidence. The case is now made to turn upon exactly opposite conclusions as to the facts in relation to the payment of a premium upon the second contract. The basis for this change in opinion is substantially the mere uncorroborated statement of an architect that he heard the general agent for appellant make the admission, about four months after the contract was consummated, that the company had been paid a premium on the supplemental contract.

My dissent is founded on practically two grounds: First, that the evidence, upon which the finding of the trial court and of this court now is based, was incompetent and insufficient to support the finding and judgment predicated thereon; secondly, that, if the evidence be regarded as competent and having any probative value whatever, the finding is so against the overwhelming weight of the evidence that it should not be permitted to stand.

The Supreme Court has set at rest all question as to the unconstitutionality of this statute, and that matter need not be further considered, although I should have liked to suggest the interpretations which, in my opinion, saved the statute from unconstitutionality. This discussion will be limited to the admissibility and competency of the evidence indicated, and its manifest insufficiency to support the finding and judgment.

Out of the multiplicity of cases on the subject, and whatever apparent conflicts there may be in the decisions, the rule is to be clearly deduced that a principal is never to be deprived of his property or rights by declarations and admissions of an agent, not made in the performance of his duties, and amounting to no more than a mere narrative of a past event. Perhaps I could not better begin the treatment of this question than by quot-

ing from Greenleaf on Evidence, vol. 1, p. 333, § 200 (16th Ed.), as follows:

"With respect to all verbal admissions, it may be observed that they ought to be received with great caution. The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistakes; the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens, also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say."

I will now cite and quote from illustrative cases, noting by the use of italics the portions of opinions which I wish to emphasize.

The case of Parr v. Illinois Life Ins. Co., a decision by the Missouri Court of Appeals, 178 Mo. App. 155, 165 S. W. 1152, is directly in point upon the inadmissibility and incompetency of such testimony, where the declarations and admissions of the agent are made subsequent to the transaction and not as a part of the very work or business he is transacting under the *authority of his principal.* The distinction between such admissions by an agent in relation to a past event and those made contemporaneously with the transaction is pointed out in that case.

In Stone v. Railroad News Co., 153 Ky. 240, 244, 154 S. W. 1092–1094, liability was sought to be fixed upon the corporation by proof of statements or admissions of the general manager after the accident In the course of the opinion it was stated:

"The rule is that the declarations of an officer or agent not forming any part of his official act or act within the scope of the agency, are not admissible against the corporation to prove an antecedent fact, nor, as a general rule, is the admission of the officer or agent of a fact tending to show liability of the corporation receivable against the corporation when made subsequent to the transaction in question, and not properly a part thereof. Elliott on Evidence, vol. 1, page 378, section 255; East Tennessee Telephone Co. v. Simm's Adm'r, 99 Ky. 404 [36 S. W. 171]. *Even if any portion of Schulz's evidence was competent for the purpose of impeaching Blackman, it was not competent as substantive evidence, and cannot, therefore, be considered in determining whether or not a peremptory instruction should have gone.* Rejecting the alleged statements of Blackman, which were clearly incompetent as substantive evidence, there is not the slightest evidence tending to show that the News Company knew, or by the exercise of ordinary care could have known, of the dangerous condition of the bottles or of their liability to explode."

Further instructive cases, which time will not permit me to discuss, are the following: East Tenn. Tel. Co. v. Simms' Adm'r, 99 Ky. 404, 36 S. W. 171; Pac. Mutual Life Ins. Co. v. Walker, 67 Ark. 147, 53 S. W. 675; Davis v. Whitesides, 1 Dana (Ky.) 177, 25 Am.

Dec. 138; Wash v. Cary (Ky.) 33 S. W. 728. In the latter case the court quoted from Storey on Agency, as follows:

"The representation, declaration, and admission of the agent does not bind the principal, if it is not made at the very time of the contract, but upon another occasion. * * * *To hold a declaration or admission of an agent which was not part of the res gestæ to be equivalent to those of the principal would render the situation of every principal perilous indeed. Although such declaration or admission might be false, yet the principal would be bound by them.*"

As further authority along this line may be cited Merrow v. Goodrich, 92 Me. 393, 42 Atl. 797, 69 Am. St. Rep. 512; Noel Construction Co. v. Armored Concrete Construction Co., 120 Md. 237, 87 Atl. 1049, Ann. Cas. 1915A, 1032; Hyatt v. Leonard Storage Co., 196 Mich. 337, 162 N. W. 951; Memphis & V. R. Co. v. Cocke, 64 Miss. 713, 2 South. 495; Moore v. Chicago R. Co., 59 Miss. 243; Mowing Machine Co. v. Pearson, 64 Hun, 638, 19 N. Y. Supp. 485; Johnson v. Ins. Co., 172 N. C. 142, 90 S. E. 124; Stone v. N. W. Sleigh Co., 70 Wis. 585, 36 N. W. 248; Emerson v. Burnett, 11 Colo. App. 86, 52 Pac. 752. In the last-cited case, the declarations of a general manager were sought to be shown to bind the principal, and it was said:

"There is no rule better settled than that the declarations of an agent, to be binding upon his principal, must be made concerning the business which he is authorized to transact, and while he is engaged in its transaction. * * * *The situation is not altered by the fact that Dorr had the general management of the ranch. As a general agent he probably had authority to conduct a variety of transactions; but each one would be distinct from the other, and his declarations concerning a particular transaction could not be a part of the res gestæ, unless made while he was engaged in that identical transaction. The principle of the rule applies to all cases of agency, whether general or special.*"

Fairlie v. Hastings, 10 Ves. Jr. 123, 32 Reprint, 791, contains an excellent exposition of the rule limiting the acts and declarations of agents to matters strictly within their authority, and the dangers of admitting mere narratives of past events, concluding with this statement:

"A party is bound by his own admission; and is not permitted to contradict it. But it is impossible to say, a man is precluded from questioning or contradicting anything any person has asserted as to him, as to his conduct or his agreement, merely because that person has been an agent of his. *If any fact, material to the interest of either party, rests in the knowledge of the agent, it is to be proved by his testimony,* not by his mere assertion."

In Merchants' Natl. Bank v. Clark, 139 N. Y. 314, 34 N. E. 910, 36 Am. St. Rep. 710, it was said:

"While evidence to show what took place at the time when the notes were offered and re-

ceived for discount, in order to prove knowledge of the bank of the fact, might be proper, subsequent admissions and declarations by individual directors, or other officers, would be of no effect to bind the bank. What they may have said, not being under oath, cannot be evidence against the bank; and upon that principle, as because the statements were not made in strict relation to any agency for the bank, such evidence is inadmissible."

It was further said that an agent "has no authority to bind his principal by any statements as to bygone transactions."

Still other illustrative cases are the following: Terry v. Birmingham Natl. Bnk., 93 Ala. 599, 9 South. 299, 30 Am. St. Rep. 87; Western Union Tel. Co. v. Way, 83 Ala. 542, 554, 4 South. 844; Clark v. Goldie, 177 Mich. 653, 144 N. W. 504, 506; Andalman v. Chicago & N. W. Ry. Co., 153 Ill. App. 169, 173; Young v. Grand Lodge of A. O. U. W., 149 Ill. App. 603, 605; Jenks v. Burr, 56 Ill. 450, 452; Pennsylvania Co. v. Kenwood Bridge Co., 170 Ill. 645, 649, 49 N. E. 215; Cleveland, C., C. & St. L. Ry. Co. v. Jenkins, 75 Ill. App. 17, 25; Taplin v. Marcy, 81 Vt. 428, 71 Atl. 72, 76; Raven Red Ash Coal Co. v. Herron, 114 Va. 103, 75 S. E. 752; Reusch v. Roanoke Cold Storage Co., 91 Va. 534, 22 S. E. 358; Atlas Assur. Co. v. Kettles, 144 Ga. 306, 87 S. E. 1; Aiken v. Tel. Co., 5 S. C. (5 Rich.) 358, 369; Hoffman v. Metropolitan Express Co., 111 App. Div. 407, 97 N. Y. Supp. 838, 841; Flour City Natl. Bnk. v. Grover, 88 Hun, 4, 34 N. Y. Supp. 496, 498; Scovill v. Glasner, 79 Mo. 449, 455; McDermott v. Hannibal & St. J. R. Co., 73 Mo. 516, 519, 39 Am. Rep. 526; Dunnington & Co. v. Louisville & N. Ry. Co., 153 Ky. 388, 155 S. W. 750, 753; Hazelton v. Union Bank of Columbus, 32 Wis. 34, 48; Hynds v. Hays, 25 Ind. 31, 34; Memphis & C. R. Co. v. Maples, 63 Ala. 601, 609; Wicktorwitz v. Farmers' Ins. Co., 31 Or. 569, 51 Pac. 75, 77; First Natl. Bnk. of Portland v. Linn County Natl. Bnk., 30 Or. 296, 47 Pac. 614; Morgan v. Royal Ben. Society, 167 N. C. 262, 83 S. E. 479, 481; Vicksburg & Meridan R. R. v. O'Brien, 119 U. S. 99, 105, 7 Sup. Ct. 118, 30 L. Ed. 299.

In Waggoner v. Snody, 98 Tex. 512, 85 S. W. 1134, our Supreme Court recognizes the rule laid down in most of the cases cited, and it was there said:

"To render the declarations of an agent admissible against the principal, such declarations must have been made concerning an act within the scope of the authority of the agent, *and at the time that the act was being performed by the agent.* If the declarations be made before or after the act was done, it is not a part of the res gestæ, therefore not admissible."

Other Texas cases in effect recognizing the same principle are: North Am. Accident Ins. Co. v. Frazer, 112 S. W. 812; Carson v. St. Joseph Stockyards Co., 167 Mo. App. 443, 151 S. W. 752; Tex. Central R. Co. v. Dumas,

149 S. W. 543; Bullock v. Houston E. & W. T. Ry. Co., 55 S. W. 184, 185; Tex. & P. Ry. Co. v. Johnson, 90 Tex. 304, 38 S. W. 520; Galveston, H. & S. A. Ry. Co. v. Jackson, 53 S. W. 81; Paris & G. N. R. Co. v. Lackey, 171 S. W. 540.

As to the effect of incompetent testimony, as probative and substantive evidence of a fact, our Supreme Court has recently clearly laid down the rule in Henry v. Phillips, 105 Tex. 459, 151 S. W. 533:

"The testimony of the witness to the effect that after the date of the deed's execution by Patillo he listed the property for sale, and inquired often as to whether it could be sold, and of another that Patillo refused to sell him a portion of the land, but offered to sell the entire tract, was not competent testimony to prove any issue in the case. The only relevant purpose for which this testimony could have been offered was for the purpose of showing that Patillo did not execute the deed in question for the purpose of conveying the land therein described. For this purpose it was not admissible, being hearsay evidence and in disparagement of the grantor's deed duly executed. * * * While the admission of this testimony was not objected to by counsel for defendants, that fact would be important only in the event its admission was afterwards complained of as violative of a right reserved to defendants. *Such incompetent testimony can never form the basis of a finding of facts in an appellate court, notwithstanding its presence in the record without objection.* When the appellate court comes to apply the law to testimony constituting the facts of the case, *it can only base its conclusion upon such testimony as is under the law competent. That which is not competent testimony should be given no probative force.* The admission of such testimony is no talisman to give effect to that which is irrelevant and incompetent to sustain or deny a material issue in a case."

It is admitted that the statements made by Mr. Coleman to Mr. Phelps, the architect, were made at least four months after the second contract was made and the premium paid, if at all. It is further undisputed that the circumstances of these statements were that they were made while these gentlemen and a third party were going to Medina Dam, in Bexar county, on a fishing trip. Mr. Phelps was even unable to definitely fix the month in which it occurred. The parties were in an automobile, and the conversation detailed by the witness was during the trip in the car to Medina Dam. Mr. Phelps could not even fix the place where the alleged admission occurred as to the payment of a premium for the supplemental contract, stating that it was either on some street in San Antonio or on the road to the fishing place.

While Mr. Phelps testified that the conversation related to the custom of surety companies, in charging an extra premium for additional work, and that he was clear in his recollection that Mr. Coleman made the statement that a premium was in fact paid, he fixes the time as several months after the

second contract was made, and states that the declaration was volunteered by Mr. Coleman. It is not claimed that there was any argument as to whether or not the premium had been paid, or that the question was in controversy, nor even that any one was claiming that a premium had been paid, but simply was a statement volunteered by Mr. Coleman, in the course of a general conversation on the customs of surety companies. Thus manifestly it is not urged that the alleged declaration of Mr. Coleman was made as the result of deliberate thought upon the question, nor even that his attention had been directed to the fact that it was being 'claimed that the company was bound on the second contract, and that a premium had been paid therefor to the surety company. In these circumstances, I earnestly insist that, not only was the admission inadmissible, upon which absolute liability is now sought to be fixed on the principal, being made long after the event claimed, but that it was not, in any just and proper sense, made while executing any matter intrusted to him by the principal, nor in the course of his duty to his employer.

To my mind, in holding that this testimony, contradicted as it was, in effect, by that of every other witness who testified on the subject, was admissible and competent, the majority have set a dangerous precedent. If this is the law, it is extremely precarious for any person or corporation to undertake to transact business through agents, general or special. As the holding is sought to be justified upon the ground that the principal here is a corporation, and that its general agent must be regarded as the alter ego of the company, it is apparent that the decision is most interesting to all who seek to do business in corporate form. As I see it, there is no real difference, as to this question, between declarations and admissions made by the agent of a corporation and of an individual. After all, the question comes back to whether the admission was made in the scope of the agent's authority, while doing the work or about the business of his principal, and under such circumstances as made it binding upon the employer. Of course, I concede that a general agent ordinarily possesses greater powers than a special or local agent, but I can never assent to the view that declarations such as are here relied upon, made in such circumstances, can absolutely bind the principal, even though a corporation, in the absence of proof that he had authority to make the admissions. In this particular case, adverse parties were careful to show the authority of the agent, made by the vice president and secretary-treasurer of the company, under general authority of a resolution by the board. It is worthy of note, however, that they did not seek to show any authority to make such an admission, nor any custom of its agents to make such.

Believing that the testimony was inadmissible and incompetent, I am of the opinion that it cannot be looked to in support of the finding and judgment of the trial court. Our Supreme Court has so declared in Henry v. Phillips, supra, and that decision has been followed by the Courts of Civil Appeals in cases cited above. The ground of differentiation suggested in the last opinion of the court is to my mind wholly inadequate and unjustified. Mr. Justice JENKINS, in seeking to distinguish Henry v. Phillips from the instant case, has stated that public policy will not permit a grantor to say that he had a secret mental reservation contrary to the express terms of his deed; hence such a statement, even if testified to by the grantor himself, could not form the basis of a verdict or judgment. It may be replied that neither will public policy permit an agent to bind his principal by such a declaration, unless made with authority and in the line of his duty. The objection goes beyond the mere claim of hearsay; it goes to the probative value of the declaration, even if admitted to have been made. The principle recognized in the decisions is that such evidence is incompetent to prove the ultimate fact, being but a mere narrative of a past and consummated transaction, the declaration not shown to have been made with authority, as well as being the purest hearsay. It is wholly lacking in probative value, especially in that the very party who is claimed to have made the declarations was a witness in the case, and denied not only the statements imputed, but positively testified on the ultimate question of fact that no premium was ever paid. Not only has this question been decided by our own courts, but there is strong authority from other jurisdictions to the same effect. In Mima, Queen & Child v. Hepburn, 7 Cranch, 290, 3 L. Ed. 348, it was said that—

"Hearsay evidence is incompetent to establish any specific fact, which fact is in its nature susceptible of being proved by witnesses who speak from their own knowledge."

To the same effect is Hopt v. Utah, 110 U. S. 574, 4 Sup. Ct. 202, 28 L. Ed. 262; In re J. S. Appel Suit & Cloak Co. (D. C.) 198 Fed. 322; Claflin v. Ballance, 91 Ga. 411, 18 S. E. 309; Eastlick v. Southern Ry. Co., 116 Ga. 48, 42 S. E. 499; Suttles v. Sewell, 117 Ga. 214, 43 S. E. 486; State Bank v. Wooddy, 10 Ark. 638.

In the last three cases it was expressly held that the admission of hearsay evidence without objection does not render it legal and admissible testimony, and that it is of no probative value. As was quaintly said in Re Case, 214 N. Y. 199, 108 N. E. 408, "Insufficient evidence is, in the eye of the law, no evidence."

I also call attention to the following line of cases, holding that awards of Industrial

Accident Boards cannot be sustained where based upon incompetent and hearsay evidence, admitted without objection, although such boards are permitted to hear such evidence, and no objection is permitted by the statute: McCauley v. Imperial Woolen Co., 261 Pa. 312, 104 Atl. 617; Valentine v. Weaver, 191 Ky. 37, 228 S. W. 1036; Reck v. Whittlesberger, 181 Mich. 463, 148 N. W. 247, Ann. Cas. 1916C, 771; Carroll v. Knickerbocker Ice Co., 218 N. Y. 435, 113 N. E. 507, Ann. Cas. 1918B, 540.

While convinced that, upon the principles and authorities heretofore stated, the finding in question must fall, I am further fixed in the view that, upon the assumption that the evidence was admissible and competent, the finding is so in the face of the overwhelming weight of the evidence that it cannot stand. The testimony of Mr. Phelps, the architect, that Mr. Coleman had volunteered the admission that a premium had been paid, is disputed by every other witness who undertook to testify on this point. If the premium was paid, by whom was it paid? Not by Mr. Hood, the contractor, for he testified that he never paid it. The owners also testified, and they disclaimed ever having paid it, or having any knowledge of its being paid. Mr. Coleman not only denied that he ever made such a statement, but swears that no premium was collected. He had the sheets from his ledger, and the file of this transaction present at the trial, and accounted for every dollar of the account relating to this contract. It was sought to be shown that the payment for a premium on the second contract was included in certain items of amounts paid to the surety company for insurance, but Mr. Coleman unmistakably showed that the checks or drafts for these amounts did not include a premium for the bond, but embraced only the cost of "liability insurance," which included a different class of undertakings. He gave in detail the numbers of the policies, and excluded any possibility that the premium for the second contract was ever paid. Furthermore, Mr. Coleman testified that he would not have executed a second bond, nor have received a premium therefor, on his own responsibility, but would have referred the matter to the general officers of the company. His reason for this statement, which is corroborated, in effect, by Mr. Hood, the contractor, was that the possible financial troubles of Mr. Hood, arising out of some litigation in Missouri, might have made the second contract an undesirable risk.

If it be conceded that Coleman was an interested witness, there is nothing whatever in this record to indicate that Mr. Hood, the contractor, was other than disinterested, as to this question. If the premium was ever paid, he was certainly the proper person to pay it, since all the funds for the building were paid to him. He positively denied ever paying it. Besides, he states a circumstance strongly corroborating this testimony. He testified that when the question of a second or new bond was being discussed, he insisted that if one was to be given he must have an additional allowance of $250. Of this amount $149 and some odd cents was for the commission to the surety company, based on 1 per cent. of the additional cost, and the $100 for expenses to St. Louis. The reason for this additional amount was that he did not hope to have Mr. Coleman make the new bond, and that it would require a special trip to St. Louis to discuss the matter with the office there. As far as the record discloses, I have not found that this testimony is disputed, nor that any such allowance was ever made or paid to Mr. Hood, for the purpose of paying the premium, or his expenses. As stated above, his testimony is also corroborative of Mr. Coleman's contention that he would not have accepted a premium for the supplemental contract without special authority from the company.

The owners made no such claim; and there is nothing whatever in this record, outside the statement of Mr. Phelps as to the admission of Coleman, which tends to show any payment. This is not all. In one of the opinions now withdrawn, it was stated that Mr. Phelps, the architect, was a disinterested witness. Let us see if he was. The owners who testified stated that they had discussed the necessity for a new bond with Mr. Phelps, who had prepared the supplemental contract, and he had a place therein inserted for the approval of the contract by the surety company. They testified that either Mr. Phelps had convinced them that there was no necessity for a new bond, or that they had looked to him to attend to this phase of the matter, and secure a new bond, if necessary. This is the positive testimony of Mr. Zilker, one of the owners. In view of Mr. Phelps' standing as an architect, and of his dereliction of duty, upon the assumption that he had neglected this important feature of his employment, can it be justly said that he was a disinterested witness?

This statement of the evidence should be sufficient to show that the conclusion of the trial court, approved by this court, was directly opposed to the overwhelming weight of the evidence. It rests wholly on Mr. Phelps' narrative of what he heard Mr. Coleman say, and without any pretense on the part of Mr. Phelps that he had any knowledge of the premium having been paid. In my judgment, this testimony amounts in any event to no more than a mere scintilla of evidence, especially under the circumstances of the alleged admission.

The testimony shows, without dispute, that the admission, volunteered by Mr. Coleman, was made in an automobile, probably

while traveling over mountain roads on a fishing trip to Medina Dam. While the parties talked, the little Ford rattled right along, and it is inconceivable that their thoughts were not to some extent upon their adventure. To any one who knows the alluring piscatorial possibilities of Medina Lake, that paradise of Texas fishermen, it seems strange to give so much force and effect to a declaration of this character, even if it were made. I am especially surprised that the Chief Justice of this court, so long and so well-known over this state as an ardent, though sometime unsuccessful, disciple of Izaak Walton, should be willing to attribute the serious result he has to the mere casual remark of even a general agent, volunteered under such circumstances.

Levity aside, I earnestly insist that such declaration was casual in every proper sense. It was not made in the line of the duty of the agent, nor in the course of his employment, in relation to a pending subject. It was in reference to an already consummated contract to guarantee the performance of the contractor's obligation to do a work, which entailed an additional cost of practically twenty per cent., and, as this court has held, changed the identity of the original contract. It was made, if at all, not in the course of a discussion as to whether or not the premium was paid, but was merely volunteered; Mr. Coleman not having been apprised that any one was claiming a payment of the premium.

It is not enough to show that the general subject of the conversation was the building in course of erection, to bring the admission within the line of the agent's authority and duty. The specific subject-matter was the acceptance of a consideration for an undertaking of the company, and that was not under discussion. All such considerations as a discussion of the progress being made by Mr. Hood on the building, and whether it was satisfactory, and what were the general customs of surety companies, are all beside the question. The crux of the whole matter is: Was Coleman in this respect about the business of his employer, and following the line of his duty with regard to the very matter of the payment of a premium? If the case is to turn upon whether Coleman was the alter ego of the corporation, then that relation must be tested, not by proof as to his power to make the original contract, nor even his authority to have accepted a premium and to have bound the company on a second contract, but his authority to bind the company by a mere admission long subsequent to the time when such undertaking was assumed, and under the remarkable circumstances disclosed by the record.

I dispute some of the facts cited in the opinion to support the finding in question, as well as the effect given them. It is stated that the relations of Mr. Coleman and Mr. Hood, the contractor, were close and confidential. I find from the record that Mr. Coleman testified, apparently without dispute, that he only knew Hood a very short time before the first contract was executed, and that he knew of him previously only by hearsay. As to the suggestion that Mr. Coleman knew of the contemplated change before and after it was made, and made no objection, this was utterly insufficient to fix any liability on the company. The agent was under no duty, indeed, had no right, to object to a new contract between the owners and the contractor. As to the circumstance that the company had received an assignment of the funds payable to the contractor under the first contract, and that Coleman had received and disbursed payments on estimates of the architect after the change, this, too, is insufficient to show, in the face of the positive testimony in this record, that the company had undertaken to become surety on the second contract. The statement of facts shows good and sufficient reasons for the making of such assignment, due to actual or probable financial difficulty of Mr. Hood, the contractor, and possible interference with and hindrance of his work from outside parties. The account was a joint control account, requiring the signatures of both Mr. Hood and Mr. Coleman before the building fund could be disbursed, and this for the reason just stated.

The fact that the estimates disclosed on their face that they included lumber and material for the fourth story is of very little, if any, weight, when it is remembered that at the time the new contract was made the building, as originally planned, was only about two-thirds completed, and the new estimates included both work under the old and the new contract. It is obvious that for the protection of the surety company's interest, Mr. Coleman might well have continued to jointly control the disposition of the funds received for the building, even though they included work under the new contract, without binding his principal to an undertaking to which it never assented, and for which it received no consideration.

It should not be necessary for me to say that I have reached the conclusion stated with regret. I am not at all unmindful of the rule requiring an appellate court to sustain the findings of a trial court upon questions of fact, where there is evidence to support them. It is not only a well-settled rule, but a very convenient one in the disposition of troublesome cases. I fear it is too often resorted to. I think I may be permitted to say that no judge has shown greater deference than myself for the conclusions of trial courts on fact questions, but surely there is a limit. There must be boundaries beyond which an appellate court may not go with-

out practically abdicating the function of revising judgments not supported by competent evidence. It is hoped that this language is not too strong, because my respect for the opinion of my Associates is only equalled by my regard for their feelings. To sum it all up, I cannot in good conscience approve the conclusion reached. If the decision must stand, it will have to be over my earnest protest, based upon a conclusion reached only after the most mature deliberation and thought of which I am capable.

I cannot conclude this opinion without acknowledging my great obligation to able counsel for appellant, whose industry and research have made available such a wealth of authority, upon the questions discussed, and whose clear and forcible arguments have greatly assisted me.