CLAFLIN & CO. *v.* BALLANCE & SORRELL *et al.*

1. In a contest between the mortgagee of an insolvent debtor and other creditors who attack the mortgage as fraudulent, acts and declarations of the debtor tending to prove fraudulent intent and motive on his part may be received in evidence for this purpose only, though such acts and declarations were subsequent to the execution or even to the foreclosure of the mortgage. They would, however, not affect the mortgagee without some evidence to connect him with the fraud of the mortgagor, at or prior to the execution of the mortgage, either by actual participation or by having notice or grounds for reasonable suspicion.

2. Declarations of the mortgagee's agent who represented him in

taking the mortgage, if made not at the time of its execution but after its foreclosure and whilst an official sale under it was in progress, the declarations not being pertinent to any business of the principal in which the agent was engaged at the time of making them, but only by way of recital either of what the agent had known or suspected or of what he then knew or suspected, would not affect the mortgagee, his principal, so as to warrant any finding based thereon against the *bona fides* of the mortgage.

3. The evidence being wholly insufficient to warrant the jury in finding that the mortgagee either participated in the fraud of the mortgagor or was chargeable with notice of the same, whether by reason of actual knowledge or grounds of reasonable suspicion, the court erred in not granting a new trial.

March 27, 1893. Argued at the last term.

Before Judge HUTCHINS.    Clarke superior court. April term, 1892.

An equitable petition was brought by creditors of the firm of Hirschfield & Blumenthal, against the members of that firm, and against H. B. Claflin & Co., John Cohen and others, for the purpose, among others, of cancelling a mortgage in favor of Claflin & Co., on the stock of merchandise and store fixtures of the debtor firm.   It was alleged that this mortgage was void, having been given by insolvent debtors in pursuance of their scheme, into which Claflin & Co. and Cohen entered, to hinder, delay and defraud other creditors.   A verdict was rendered, finding that the mortgage was void. Claflin & Co. moved for a new trial, which was denied, and they excepted.

The following appears from the evidence:   The debtor firm were in business in Athens from April, 1885, to November 16, 1889.   On February 2, 1887, they owed $1,040 to Claflin & Co., of New York, and made a written statement that they owed no one else anything and had assets over $11,000.   On August 4, 1887, they made a similar statement to Claflin & Co., showing assets over $13,000, and liabilities $4,000, of which $1,750 was for borrowed money and the rest for merchandise, mainly new goods for fall trade; that

$750 of the loan would mature in three days, and was provided for, that they were insured for $10,000, and would buy about $8,000 in all.   This statement contains the following :   " Mr. B. agrees to give us John Cohen as indorser.   He is, he thinks, worth $8,000 to $10,000. This is confidential."   On August 6, 1888, they made another written statement to Claflin & Co., showing assets of $12,000 and liabilities of $1,773, made up of $673 due Claflin & Co., and $1,100 due bank; showing further, that they owned 192 acres of land worth $800, were insured for $12,500, owed no confidential debts whatever, and were worth over $10,000 clear of all debts.   On November 20, 1888, they made to William Fleming a note for $4,972.20, and a mortgage to secure it, covering their stock of goods and all notes and accounts due them.   Neither the note nor the mortgage, as introduced in evidence, bore any indorsement or credit, nor was the mortgage recorded, it having been withheld from record at the request of the debtor firm. A day or two after it was taken, Blumenthal asked the attorney for Fleming if he represented any commercial agencies, and, if he did, not to say anything about the Fleming mortgage.   It appears that when this note and mortgage were given, the debtor firm took up notes which they had previously given to Cohen, and which he had given to Fleming as collateral security for a debt he owed Fleming, the notes so taken up being, as claimed, for money loaned the firm by Cohen.   On April 29, 1889, the debtor firm made another written statement to Claflin & Co., for the purpose of continuing a line of credit with them, and as a basis for present and future sales, showing assets of $15,000 and liabilities of $3,400, of which $2,400 was owing to Claflin & Co., and $1,000 to others; showing also, that they owed nothing for borrowed money, and had no other individual or firm liability, carried $10,000 insurance, had annual sales of

$22,000 and annual expenses of $3,000. On August 10, 1889, they made a written statement to one of the plaintiffs, a firm in Baltimore, "for the exclusive use of" said firm, showing assets of $13,000, and no liabilities of any kind. Two days afterwards they made another statement to Claflin & Co., that their condition had not changed materially from last statement, except liabilities were less, all of which (about $900) were to Claflin & Co., and "will always protect H. B. C. & Co." On September 13, 1889, they wrote to Claflin & Co.: "Your statement and notes on hand, and in regard to same we ask you to make the amount of our accounts payable Dec. 1–4, deducting from the note the discount due us. We adopt this plan because we are determined to pay you this fall before paying anybody else, on account of your leniency toward us last fall." A receipt of William Fleming recited that $1,200 was paid by the debtor firm on their note to him, by due-bills of A. Jacobs, being $600 November 4, and $600 November 14, 1889. On November 13, 1889, the debtor firm telegraphed to Claflin & Co.: "Wire us at once the whereabouts of Mr. Frank. Also wire him to come to Athens at once. Strictly confidential." On the same day Claflin & Co. telegraphed to Frank at Nashville, Tenn.: "Hirschfield & Blumenthal, Athens, Ga., want you there at once. Better go." Two days afterwards Frank telegraphed from Athens to Claflin & Co.: "By advancing thirty-five hundred, party will give us mortgage for that amount and our debt on stock which I consider ample. Answer." On the same day Claflin & Co. answered: "If no other arrangement possible, we do not object advancing amount named, provided all can be amply secured beyond question. Why not give mortgage to us and other parties also? If mortgage is made, it should include ten per cent. to cover attorney's fees. Do what seems safest and can be closed quickest with

least expense and trouble." Next day (November 16, 1889) Frank took from the debtor firm a mortgage for $7,773, besides ten per cent. attorney's fees, due same day, this being the mortgage attacked; and gave a sight draft on Claflin & Co. for $3,500, the balance claimed to be due on the debt secured by the Fleming mortgage. The draft was indorsed by the debtor firm to John Cohen, and was paid in New York. The Claflin mortgage, which was given on Saturday, was foreclosed on the next Monday, and the stock of goods was sold under a ten day order, and brought about $10,800. The sheriff had taken an inventory of the stock, which aggregated $14,000. The debtor firm had bought about $24,000 worth of goods for the fall trade, and had paid little if anything. Most of the plaintiffs' debts were contracted from July, 1889, up to the failure. On the day the Claflin mortgage was made, Thomas, one of plaintiffs' attorneys, went to the store of the debtor firm, and presented an account for payment. Blumenthal requested him to wait a few days, and he would arrange the matter satisfactorily. Thomas asked if the firm was in any embarrassment, or if any trouble was likely to happen to them of which they had any information, and Blumenthal replied, none whatever. At that time Claflin's agent was in the rear of the store. Blumenthal said there was no reason to be troubled about the account presented. On November 22, Thomas took from the debtor firm notes for six of his clients, and a mortgage to secure them. On the night of the day the Claflin mortgage was foreclosed, Rucker, another of plaintiffs' attorneys, went to the store to see what could be done with his claims, and found the store closed and locked. The sheriff and Isaac Frank were inside. Frank was present for several days after the failure, and attended the sale, as did some of plaintiffs' attorneys, and the attorneys for Claflin & Co. A large crowd was present,

including a man from Atlanta. Frank had been to Atlanta. The stock was being sold in large lots, which method had been suggested by Blumenthal. Rucker had some second mortgages, and wanted the goods to bring all they could. He knew there was no chance for small buyers, and a lot of little country merchants were there and could not get in it, and he objected to it. Frank objected to the goods being cut up into small lots; he thought they would bring more if sold in the way begun. The sheriff changed the method and sold them out in detail. Blumenthal made purchases, bought a large lot of the goods for which John Cohen paid the sheriff. Frank had a book, keeping the amount of sales. He and Blumenthal would talk frequently. Rucker and Frank had several conversations after the failure. Frank characterized the whole thing as a steal. He said the debt for which he had taken the mortgage was made up of goods bought of Claflin & Co. and for cash paid. He said he let them have the $3,500 to pay the mortgage to John Cohen, and that he thought the mortgage was a sham one. Rucker said, the plan was to get the money for Hirschfield & Blumenthal. Frank said, "Don't you think I understand the whole thing?" He also stated to the sheriff, in regard to the failure, that the whole thing was a steal. There was other evidence going to show fraud on the part of the debtor firm, and perhaps of Cohen; but none that seems to relate to any participation or knowledge of Claflin & Co. or their agent. Some of the testimony appearing in the foregoing recital, and other evidence of like character, was objected to by counsel for Claflin & Co., on the grounds that the matters testified to occurred after the taking of the Claflin mortgage, and were not pertinent on the issue as to the validity of that mortgage until it was first shown that Claflin & Co., or their agent, had some connection with them, no light being thrown by these

transactions on the intent with which the mortgage was taken, and their tendency being to impress the jury with the idea that such conduct on the part of the debtors was proper to be considered in deciding on the validity of the mortgage. The overruling of these objections formed several of the grounds of the motion for new trial, which further complained that the verdict was not warranted by the evidence.

LUMPKIN & BURNETT, for plaintiffs in error.

BARROW & THOMAS, T. W. RUCKER, A. S. ERWIN, A. J. COBB, TUCK & HENLEY, THOMAS & STRICKLAND and T. S. MELL, contra.

BLECKLEY, Chief Justice.

1. For a mortgage made by a debtor in favor of one of his creditors to be defeated by his fraudulent intent as against other creditors, two things must be shown: first, that such fraudulent intent existed; and, second, that the mortgagee was connected with the fraud, either by participating in the intent, or by having notice of it or grounds for reasonable suspicion. On the first of these questions, acts and declarations of the debtor, indicative of such intent, are competent evidence, without reference to whether they were known to the mortgagee or not. And to render them competent, it is not necessary that all of them should have transpired at or before the execution of the mortgage, or even before its foreclosure. A scheme of fraud may manifest itself partly before and partly after the main fact. Indeed, the only decisive external circumstances capable of proof may all occur afterwards. The perpetration of a fraud rarely happens as an isolated act; it usually comprehends a course of conduct projected and pursued as means of securing the fruits of the fraud. The fraudulent mind is selfish; it wants to make something by its rascality. Acts embraced in the fraudulent scheme,

and performed in carrying it out to the ultimate selfish result contemplated, belong to the *res gestæ* of the fraud; and the same is true of any declarations accompanying these acts which tend to explain and give them charac- ter. To run down and expose an alleged fraud, it is generally necessary to frame some hypothesis concern- ing the whole course and range of conduct which would be involved in the fraudulent scheme to render it suc- cessful. If the hypothesis, as such, be sound in itself, the next step is to ascertain by evidence whether the accomplished facts of the case conform to it. The in- vestigation would be futile as a verification of the hypothesis were the evidence limited to a field of accom- plished facts less extensive than that covered by the hypothesis. The unaccomplished facts, if any, though a necessary part of the hypothesis, could only be in- ferred as embraced in the projected scheme of conduct, since their non-accomplishment would preclude proof of them as actual conduct. As evidence to establish the fraudulent intent of Hirschfield & Blumenthal, the mortgagors, in executing the mortgage to Claflin & Co., their acts and declarations connected with the hypothet- ical fraudulent scheme, their acts done and declarations made at any time from the conception of the scheme down to the time of trial, would be competent; for so long as the scheme was pending and anything remained to be done to take or to secure its fruits, it would neither be too early nor too late for them to manifest their real intention. But the effect of the evidence was properly restricted to the one purpose of convicting them of a fraudulent intent. It could not be used to prove notice on the part of Claflin & Co. of that intent, or that they had grounds for reasonably suspecting it, or that they participated in the fraud in any manner whatever. It would simply supply one of the two necessary links in the chain of evidence necessary to vitiate the mortgage;

it would neither dispense with the other link nor sup-
ply any part of it.

2. The declarations made by Frank, the agent of
Claflin & Co., whilst the official sale of the goods under
the mortgage was in progress, merely asserted his own
knowledge or suspicions, past and present, touching the
fraudulent nature and purpose of the mortgage. He
was certainly not the agent of his principals to make
these declarations, for they were not pertinent nor ap-
propriate to the transaction of any business which he
was then transacting in their behalf. Surely an agent
cannot destroy a mortgage by talking it to death after
he has taken it and while attending a sale which an
officer is making to convert the mortgaged goods into
money. Any finding against the *bona fides* of the mort-
gage based on these declarations would be wholly un-
warranted. What Frank knew, or what he suspected
on reasonable grounds of suspicion, at the time of taking
the mortgage, would be imputable to his principals; but
this would have to be proved by evidence other than
his subsequent declarations. Any mere recital of his
knowledge or suspicions by subsequent narration would
not affect them. Nor would any knowledge acquired
by him, or even by themselves, after the mortgage was
executed and delivered, or any suspicions originating
thereafter, count for anything.

3. As stated in the third head-note, the evidence was
wholly insufficient on a vital part of the case, and the
court erred in not granting a new trial.

*Judgment reversed.*