## FREEMAN *v.* THE STATE.

HINES, J. 1. The State introduced evidence of certain incriminatory statements alleged to have been made after the homicide by the defendant to the arresting officer, in effect as follows: .(1) That she and the deceased, who was her husband, were tussling over a gun, he having hold of the stock of the gun and she having hold of the barrel, and the gun went off; (2) that she and the deceased had a fuss, and he threatened to shoot her, and they got to tussling over the gun, and it went off accidentally; and (3) that the deceased told her he would shoot her, and grabbed his gun, and they got to tussling over the gun and it went off and killed him. *Held:* Upon proof by the State of the above statements of the defendant, the court erred in omitting to charge, without request, the provisions of law defining manslaughter and voluntary manslaughter, embraced in sections 64 and 65 of the Penal Code. *Drane* v. *State,* 147 *Ga.* 212 (93 S. E. 217); *Booker* v. *State,* 153 *Ga.* 117 (111 S. E. 418). It was for the jury to say whether, under the proof, they believed that the defendant and her husband had a fuss, that he threatened to kill her, that he grabbed his gun, that they tussled over it, and that it was discharged and killed the husband, and. if they believed such state of facts existed, and the wife intentionally shot and killed him while they were tussling over the gun, whether she was guilty of murder or of voluntary manslaughter. The case differs from that class of cases in which the evidence for the State demands a verdict of murder, and the evidence for the defendant, or his statement, demands a verdict of not guilty, as voluntary manslaughter is not involved under such circumstances. *Robinson* v. *State,* 109 *Ga.* 506 (34 S. E. 1017); *Hunnicutt* v. *State,* 114 *Ga.* 448 (40 S. E. 243); *Clark* v. *State,* 117 *Ga.* 254 (43 S. E. 853).

2. The defendant timely requested the court to instruct the jury "that if the defendant, Lula Freeman, killed the deceased without any intention to do so, but in the commission of an unlawful act, she would be guilty of involuntary manslaughter in the commission of an unlawful act." The court declined this request, and the principle embraced therein is not covered by the general charge. Besides the evidence of her statements set out in the preceding headnote the jury had before them the defendant's statement in which she gave this version of the homicide: Her husband came to the door and said: "Find me my gun," and she said: "What for?" He said: "I am going to kill you," and she said: "What?" and he said: "Yes, I am," and then he slapped her, and she said: "Don't slap me," and he said: "I will kill you," and he took up the gun and they tussled over it, and the gun fired.

24

She did not kill him. She did not intend to kill him. She was trying to keep him from killing her. *Held:*

(a) Where there is evidence sufficient to raise a doubt, however slight, upon the question whether the homicide was murder or manslaughter, voluntary or involuntary, it is the duty of the court to charge on all these grades of homicide. *Wynne* v. *State*, 56 *Ga.* 113; *Jackson* v. *State*, 76 *Ga.* 473 (3).

(b) Under the proof by the State of the statements alleged to have been made by the defendant, and under her statement to the jury on the trial, the court erred in not instructing the jury as requested. *Boyd* v. *State*, 136 *Ga.* 340 (2) (71 S. E. 416).

(c) The instant case differs from *Robinson* v. *State*, 124 *Ga.* 787 (53 S. E. 99), where the evidence for the State demanded a verdict of murder, and where the defendant introduced no evidence, but made a statement. which, if credible, established a homicide by misfortune or accident. We cannot say that the evidence, in view of the proved statements of the defendant made after the homicide, and her statement made at the trial, if both or either were credible, demanded a verdict of murder; nor can we say that these statements demanded a verdict of acquittal on the ground that the homicide was accidental.

(d) This case differs from *Allen* v. *State*, 134 *Ga.* 380 (67 S. E. 1038), in which the evidence presented only two phases of homicide, viz., that of murder or accidental homicide, and in which the judge constructed his charge according to the case as made by the evidence, and in which there was no request by the defendant for a charge upon the law of involuntary manslaughter.

(e) If there is anything to the contrary of what is ruled under paragraph (b) of this note in the second headnote in *Drane* v. *State*, supra, that decision was not by a full bench, and must yield to the older case of *Boyd* v. *State*, supra, in which the decision was by a full bench.

(f) An instruction which embraces the law embodied in section 40 of the Penal Code, and applicable to the defense that a homicide was one by misfortune or accident, does not cure the omission of the court to give in charge the law of involuntary manslaughter, when the latter grade of homicide is involved in a case.

3. The defendant complains that the court erred in refusing to give in charge to the jury, when timely requested so to do, section 70 of the Penal Code, defining justifiable homicide. An inspection of the charge discloses that the principles of self-defense, embraced in this section, were carefully and aptly stated to the jury; and for this reason this assignment of error is without merit.

4. The defendant excepts to the following charge to the jury: "Now the evidence in this case is what is known as circumstantial. There is no evidence here of a person who swears directly that they saw the crime committed. The evidence, therefore, is purely circumstantial. Circumstantial evidence is proof offered for the purpose of establishing facts pointing to the guilt of the defendant. Now, in order to convict upon circumstantial evidence, the facts that are proven in the case must not only point to the guilt of the defendant, but they must be facts that point so clearly to the guilt of the defendant that they cannot be explained upon any other reasonable hypothesis except that the defendant

is guilty as charged in the indictment. It is for the jury to pass upon the facts and determine what facts are proven and what facts are shown beyond a reasonable doubt. You find out what facts are shown beyond a reasonable doubt, and then see whether or not those facts can be explained upon any other reasonable supposition or hypothesis except that the defendant is guilty. If they can be explained upon any other reasonable hypothesis or theory or supposition other than the defendant is guilty of the offense charged, then the facts proven would not be sufficient, and the evidence would not be sufficient to authorize a conviction. But, on the contrary, if the facts that are proven not only point to the guilt, but point so clearly to her guilt they cannot be explained upon any other theory except that the defendant is guilty of shooting intentionally William Freeman Jr., under circumstances which show murder, if the facts proven show that, and point to that conclusion so clearly there is no escape from it by any reasonable hypothesis, then it would be your duty to convict her, notwithstanding the evidence is circumstantial." The errors assigned on this charge are (1) that it assumed that a crime had been committed, and (2) that the record failed to show that the defendant shot her husband intentionally. *Held:* It is error for the court to assume or seem to assume that a transaction was a crime. *Minor* v. *State,* 58 *Ga.* 551 (3); *Phillips* v. *State,* 131 *Ga.* 426 (62 S. E. 239). For this reason this instruction was erroneous.

5. The other errors of which the defendant complains in her motion for new trial are without merit.

6. As we grant a new trial, we express no opinion upon the evidence.

*Judgment reversed. All the Justices concur.*

No. 4298. MAY 15, 1924.

Murder. Before Judge Mathews. Bibb superior court. March 23, 1924.

Lula Freeman was indicted for the murder of her husband, William Freeman Jr. On the trial of the case the State introduced the following evidence: Lou Walker testified substantially as follows: I live in Bloomfield, diagonally across the road from where William Freeman Jr. lived. Was at home the day he got killed. It was in August of last year. Saw him that morning before he was killed on his motorcycle in his yard. He drove it out of the front yard, got off, and went around the back of his house. Was at the well drawing water, and saw him. Saw him disappear around back of his house and then went on in my house. When I got about midway of my house I heard a gun fire. Went over there after the shooting, because I heard Lula Freeman hollering: "Oh, Mrs. Freeman, come here quick. Son done shot himself." Lula called William "Son." Mrs. Freeman was William's mother. When I got there Mr. Clark and Janie Stewart and Mrs. Freeman's little girl were there. I saw the dead man.

He was lying at the back door inside with his feet six or eight inches from the door, and his head lying out in the room. His brains were shot out. I saw them lying on the floor in the room, and some spattered on the door facing. This house is in Bibb county. (Cross-examination.) I did not see the killing. The dead man had a pistol in his bosom. It was early in the morning. The deceased was shot just about his right eye. He was shot with a shotgun. (Redirect.) After everybody had left the house, Mrs. Freeman went on the back porch and said: "Lordy, here is my child's hat." The hat had a hole in it in the rim. It was a black hat. The shotgun was on the bed in the front room when I got there. It was about five minutes after I heard the shot before I heard the defendant holler.

Janie Stewart testified substantially as follows: I knew William Freeman, husband of the defendant. I was at home the morning he got killed. I was inside my house when I heard a gun fire. I heard the motorcycle that morning about five minutes before I heard the gun fire. When I heard the gun fire I went on my porch and the defendant was coming out of her door. She hollered to Mrs. Freeman to come there quick, and Mrs. Freeman came up the road and asked the defendant what was the matter, and the defendant said she and Son were tussling over the gun and the gun shot him. This is all I heard the defendant say. I went in the house and saw the deceased lying on the floor with his feet towards the door. He was shot in the head and it had a hole in it.

Lou Freeman testified substantially as follows: I am the mother of the deceased. I was at home the day he was killed. I saw him soon that morning out in his yard. I was milking when I heard the gun, and I then went on my porch and strained my milk. It was a good while after I got through straining my milk before the defendant called me. She said: "Oh, Mrs. Freeman, come here quick; Son done shot me." and I said: "About what?" And she said: "Son done shot himself." She said Son shot her, and then she said he shot himself. I went down there. When I got there no one was there but the defendant and her three-year-old baby girl. I saw my son lying in the room with his feet close to the door. There was a hole over his right eye where he was shot. The wadding went out behind and out of the door, what didn't go in his head. There was not a shot in the door. Blood and brains

were spattered all up by the door-facing, about as high on the door as he was, about the height of his head. It looked like his head was at the door when the gun fired. There was a screen door which would not stay open unless you held it. No shot hit inside the room anywhere. My son's gun was across the bed in the front room. He was lying in the back room, and the gun was on the bed in the front room. The nearest part of the bed was about two feet from the door as you go in. The bed was not made up. My son carried four or five hundred dollars insurance in a Jacksonville company, payable to the defendant. I live over 100 yards from the defendant's house. I did not see the killing.

R. H. Raley testified substantially as follows: I know the defendant. On the morning of the 30th of August I was called as deputy sheriff to the defendant's house. I saw the dead man. His feet were lying nearly in the back door and his head out towards the fireplace. He was shot through the right eye, and it came out back here. The shot went through. The wound was made with a shotgun, and was an inch or an inch and a half in diameter. The back of his hat was shot out. The shot just missed the crown and went between that and the brim and tore out the brim. The deceased was five feet, five or six inches tall. I found no shot mark in the house anywhere. I found brains on the facing of the door coming in from the back veranda. About five feet, two inches from the floor were brains and gun-wadding sticking to the door-facing, that looked like they had been spattered up there. The screen door was not open when I got there. There were no shot marks on it. I arrested the defendant. She said they were tussling over the gun and it went off. She said they were right at the foot of the bed; that the deceased had hold of the stock of the gun and she had hold of the barrel. The defendant looks like she would weigh 115 or 120 pounds. I suppose she is 25 or 30 years old. She told me they had a fuss. She said the deceased told her he would shoot her. The deceased's pistol was in his bosom.

J. C. Holloway testified substantially as follows: I think Freeman got killed August 30, 1923. After I heard of the killing I went to the house. I saw the defendant. I asked her about the killing. She was dressed up like she was going to church. I asked her where was Son (everybody called the deceased Son), and she said in the back room. I said: "Is he dead?" She said: "Yes."

I said: "How did he get killed?" and she said they were tussling over the gun and it went off and killed him; that she had hold of the barrel and he had hold of the stock, and it shot him. She said they were sitting on the bed. There was only one bed in the room, and coming from the back it would be on the left of the door and was 15 or 18 inches from the door. I saw the deceased lying on the floor, his feet not over 8 or 10 inches from the door and his head inside. I found some of his brains on the screen door and some on the back porch. I found no shot marks in the house. His hat was on the back porch.

The defendant made the following statement: "Gentlemen of the jury, the morning that accident happened me and my husband, he come in the door, and he says, 'Find me my gun,' and I says, 'What for?' and he says, 'I am going to kill you,' and I says, 'What?' and he says, 'Yes, I am,' and then he slapped me, and I says, 'Don't slap me,' and he says, 'I will kill you,' and he took up the gun, and I was standing by the door and I caught hold of the door, and he was on the bed, and we tussled over the gun and the gun fired. I didn't kill him. I did not intend to kill him. I was trying to keep him from killing me. He beat me that night and before that, and I have got a sore on my leg now, and I quit him once and went back to him. I have three little children. I had only two when I left him; and his sister can tell you he fired a pistol at my feet and said he was going to kill me. I stayed with him eight years, and he has never treated me right, and I have bruised places on my legs now, and he would get drunk and come home and beat me, and sometimes he would beat me for anything. If the chickens got in the garden he would kill them, and I would say, 'Don't do that,' and he says, 'I will kill you, not only the chickens.' But I didn't kill him. It was an accident. I was trying to keep him from killing me. I am 25 years old, and weigh 117 pounds. I was raised in Bibb county, and I have three little children, one 7 and one 5 and one 3. I have been in jail nearly three months. This is the third time I have been there. I stayed there a short time the first time, but the last time I have been there nearly three months."

R. H. Raley, recalled by the State, in rebuttal, testified: It is not possible for anybody to fire a gun from the bed or anywhere near it and blow the brains on the door-facing because, like this

was the door, the bed was over here, the long way about that far from the door-facing, and the brains were on the inside of the door-facing sticking up there with the gun-wadding. A person would have to be standing to the right of the bed, to shoot the deceased and scatter the brains like they were. The door swung back here, and the shot would have to come from in here. The brains were five feet, two inches from the floor.

The jury returned a verdict finding the defendant guilty, with a recommendation, and she was sentenced to imprisonment for life in the penitentiary. She moved for a new trial on the general grounds, and on special grounds which appear from the headnotes. The judge overruled the motion for new trial, and the defendant excepted.

*John R. Cooper* and *W. O. Cooper Jr.*, for plaintiff in error.

*George M. Napier, attorney-general, Charles H. Garrett, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.