*McElreath & Scott* and *E. E. Pomeroy,* contra.

---

### GOODSON v. THE STATE.

HINES, J. 1. A witness is always presumed to be competent. *Adams* v. *Barrett,* 3 *Ga.* 277.

2. When a witness is objected to on the ground that he is incompetent

to testify, the question must, as a general rule, be decided by the court. Code (1910), § 5856; *Dowdy* v. *Watson,* 115 *Ga.* 42 (41 S. E. 266).

3. If, upon the preliminary examination, the witness appears to be competent, he should be permitted to testify; but if from the evidence his competency is doubtful, his competency depending upon a question of fact, and the court submits to the jury the determination of such fact, the jury should be instructed to determine this question of fact, and, if they should find the witness to be incompetent, not to consider his testimony. *Dowdy* v. *Watson,* supra.

4. There was evidence sufficient to support the preliminary finding of the trial judge that Julia McKennie was not the wife of the defendant, and that she was not incompetent to testify against him on the ground that she was his wife; and the court was authorized under the evidence to submit to the jury the question whether this witness was the wife vel non of the defendant, and to instruct them, if they found she was his wife, that they should disregard her testimony in passing upon his innocence or guilt.

5. The court charged the jury as follows: "Now in considering the question of the common-law wife, I charge you this law:    If a woman cohabits with a man under promise to marry her legally, but, finding he does not take legal steps to do so, quits him and again cohabits with him, she is not his wife, and is a competent witness on his trial for crime." The defendant excepts to this charge, on the ground that it is without evidence to support it. This exception is well taken. *Held:*

(*a*) A charge to the jury which is not authorized by the evidence, and which is calculated to mislead and confuse the jury, requires a new trial. *Southern Marble Co.* v. *Pinyon,* 144 *Ga.* 259 (2) (86 S. E. 1086); *Betts* v. *State,* 157 *Ga.* 844 (3) (122 S. E. 551).

(*b*) The question whether Julia McKennie, a witness for the State, was the wife vel non of the defendant, being a close one, under the evidence, the above instruction on this issue was calculated to mislead the jury and was harmful to the defendant. This misdirection requires the grant of a new trial.

6. Sephus Collins, a witness for the defendant, testified· as follows, on his direct examination: "These people lived on my place when Williams got killed.  About ten o'clock that night Henry came up to my house about 350 yards, and stayed there about ten minutes and went back, and I never saw him any more until the following Saturday, when he came back with a wagon and said he came after his things; and I asked him what he killed that negro for, and he says, 'When I went back from your house last Monday night and went in the house, they had made them a mattress down on the floor, and when I walked in they was lying together, and I just couldn't stand it and I picked up the ax and hit him.'  When he was at my house that Monday night he appeared like he usually does; appeared to be all right.  I had been off that evening, and when he came up and asked Mrs. Collins if I had come back, and she told him that I had, and I heard him say, 'You tell Mr. Sephus I want him to come down there in the morning and run that negro off.'  'If I had my gun, one or the other

of us would leave there,' and he went back towards home." The same witness, being recalled by the State, testified as follows: "I have heard the defendant make a statement twice about the killing. He never made a statement like he made on the stand. He said the dead man was there on the mattress with the woman when he struck him, and didn't say anything about a knife. He said they were lying down there on the mattress together." In his statement the defendant gave this account of his killing of the deceased: He had been away from his home some 25 or 30 minutes. On his return he opened the door and saw the deceased and Julia McKennie lying down together, hugged up with each other on a pallet. As he walked in and opened the door, the deceased jumped up and made for him with his knife, and when he did so the accused got an ax which was sitting beside the door and with it hit the deceased on the side of his head. The evidence disclosed that the deceased died from this wound. The defendant insists that the court erred in failing to instruct the jury the law upon the subject of voluntary manslaughter, as this grade of homicide was involved under the above state of facts. *Held:* So much of the first statement above made by the defendant to Sephus Collins, and first narrated by him, when sworn as a witness for the defendant, being exculpatory in its nature, was hearsay evidence, and was for the defendant without probative force. *Claflin* v. *Ballance,* 91 *Ga.* 412 (18 S. E. 309); *Eastlick* v. *Southern Ry. Co.,* 116 *Ga.* 48 (42 S. E. 499); *Suttles* v. *Sewell,* 117 *Ga.* 216 (43 S. E. 486); *Estill* v. *Citizens & Southern Bank,* 153 *Ga.* 618, 621 (113 S. E. 552). So this evidence standing alone would not require any instruction upon the law of voluntary manslaughter, arising from this statement of the defendant so proved in his own behalf. When the State recalled this witness and proved the same statement made by the defendant to this witness, it then became the duty of the trial judge to give in charge to the jury the law applicable to any theory of homicide arising from the facts embraced in the statement of the defendant proved by the State. *Freeman* v. *State,* 158 *Ga.* 369 (123 S. E. 126). It follows that the trial judge should have instructed the jury that if they found that the defendant and the witness, Julia McKennie, were husband and wife, and that the situation as disclosed to the husband was such as to show that the wife and the deceased were committing adultery in the presence of the defendant, and that the killing was necessary, or apparently so, to prevent the commission of the sexual act or the completion of it, he would be justified in killing the defendant; but if the circumstances were not such as to make him believe it was necessary to take the life of the deceased to prevent sexual intercourse with his wife, but that the defendant killed the deceased under a violent and sudden impulse of passion, engendered by the circumstances, the homicide would be manslaughter. *Patterson* v. *State,* 134 *Ga.* 264, 266 (67 S. E. 816).

7. Applying the principles ruled in the 5th and 6th headnotes above, a new trial should be granted.

*Judgment reversed. All the Justices concur.*

Russell, C. J., and Atkinson and Hill, JJ., concur in the judgment.

No. 5266. April 16, 1926.

Murder. Before Judge Sheppard. Tattnall superior court. December 23, 1925.

Henry Goodson was indicted for the murder of Willie Williams. He was tried and convicted, with a recommendation. He made a motion for a new trial upon the general grounds. By an amendment he added the following grounds:

1. Because the court erred in permitting Julia McKennie, a witness for the State, to testify, over the objection of the defendant that she was his wife and for this reason was incompetent to testify against him, the defendant not being charged with any offense under the laws of this State wherein the wife is permitted to testify against her husband. Movant, through his counsel, insisted said witness was the wife of the defendant on trial, and offered to submit testimony in proof thereof; and he insisted that, this question being at issue, the witness should not have been permitted to testify until the question was determined. The court, over the objection of movant, permitted the witness to testify. Movant insists that the evidence, as afterwards brought out, established the fact that the witness was the wife of the defendant on trial, and was therefore an incompetent witness against him.

2. Because the court erred in charging the jury as follows: "Now, in considering the question of the common-law wife, I charge you this law: If a woman cohabits with a man under promise to marry her legally, but, finding he does not take legal steps to do so, quits him and again cohabits with him, she is not his wife, and is a competent witness on his trial for crime." Movant says that said charge was error for the following reasons: (a) It was not applicable to the facts in the case, or the evidence. There is no testimony to the effect that the witness Julia McKennie cohabited with defendant under promise to marry her legally. (b) There is no evidence that after cohabiting with the defendant she quit him and afterwards cohabited with him; and said charge was therefore not applicable to the facts in the case. (c) Said charge was prejudicial to the defendant, in that it tended to confuse and mislead the jury, and was calculated to cause the jury to have the impression that the court did not believe that under the evidence the witness Julia McKennie was the common-law wife of the defendant. Movant says that while the charge given may

have been correct as an abstract principle of law, yet it was not at all applicable to the facts in the case on trial, and the giving of said charge was harmful to movant as herein set out, and because of said charge a new trial should be granted.

3. Because the court erred in failing to charge the jury the law of voluntary manslaughter, and particularly the law of voluntary manslaughter as applicable to those cases of "equivalent circumstances" justifying the excitement of passion and excluding all idea of deliberation or malice, either express or implied. Movant contends that there was testimony tending to show that the defendant committed the offense of voluntary manslaughter, if he committed any offense at all. Movant says that this contention is borne out by the following testimony of Cephus Collins, to wit: "These people lived on my place when Williams got killed. About ten o'clock that night Henry came up to my house, about 350 yards, and stayed there about ten minutes and went back, and I never saw him any more until the following Saturday, when he came back with a wagon and said that he came after his things; and I asked him what he killed the negro for, and he says: 'When I went back from your house last Monday night and went in the house, they had made them a mattress down on the floor, and when I walked in they was lying together, and I just couldn't stand it, and I picked up the ax and hit him.' When he was at my house that Monday night he appeared like he usually does; appeared to be all right." Movant contends that said evidence tends to show that the killing was the result of that sudden, violent impulse of passion supposed to be irresistible, under circumstances sufficient to excite passion, and to exclude all idea of deliberation or malice, either express or implied; and that the offense of manslaughter was involved, and the court erred in failing to give said law in charge to the jury.

On the subject of a marriage to the defendant Julia McKennie testified as follows: "I am not married. I have been married to Sam McLeod, but he got in the gang, and after he got out he died. . . I never did marry Henry [the defendant], but I lived with him, and followed him down to Cobbtown, and stayed down there about a month . . before this man was killed. Cross: I first commenced living with Henry six or eight months ago, and had been living with him ever since until he got

arrested. We lived together as man and wife. We talked about getting married. We agreed to marry, and we lived together under that agreement as man and wife. We lived together first at Walter Coleman's still, under that agreement to be his wife. We lived there several months. We moved from there to my mother's, and continued to live under that agreement just like we had done before. And after living at my mother's under that agreement for several weeks, we moved over near Cobbtown, near Sephus Collins' house. During all this time we were living together under that agreement to be man and wife. I held myself out to the public all of the time as 'Henry Goodson's wife,' and it was generally known by the white people around there that I was Henry's wife. When we were first living together as man and wife out at Mr. Walter Coleman's, this man Will Williams met me in Vidalia one Saturday afternoon and went out home with me, to carry some groceries. Henry was sick in bed at the time, and Will stayed there with me until Monday. Will had been my man before that time. When I was married to Sam McLeod and he got on the gang and I left, and I stayed with Will then. I don't know whether that is why he went to Cobbtown or not, but I think that is why he went there. He went to see me once out at Mr. Walter Coleman's still, and Mr. Coleman ran him off; and after we left Mr. Coleman's and went over to Cobbtown, it was not long before Will went over there. I wrote him to come, for I wanted to see him mighty bad. I loved him more than I did Henry, and I wanted him more than I did Henry, and I wrote him to come; and about the second Saturday after we got over there he came, and he stayed with me Saturday night, and he spent Sunday with me, and he spent Monday with me, and on Monday we went to pick cotton, and me and Will went off one way, and Henry he stayed at Mr. Collins' to work in tobacco. We came back home before dark, and Henry saw us coming, and we all ate supper and Henry went up to Mr. Collins' to get some snuff or tobacco. . . He left me and Will there. It isn't a fact that when Henry came back he found me and Will lying down on a pallet; for I didn't do that with Will when I was staying with Henry. I wrote him this card: 'Mr. Will; Lyons. Dear Sir. I am well; hope you are well; I am out here four miles from Cobbtown, and I want you to come to Cobbtown. Write me what day you will come, and I will

meet you there. Be sure and come. I don't want to see no one but you. Everytime I think of something you told me last time we were together I could cry; every time I look at that you give me, I cry, every time I look at it.' . . No, I didn't want to get rid of Henry as a husband; if I had, I could have stayed with Ma. It is a fact that I lived with him as man and wife for six or eight months, and held myself out to the public as his wife. Redirect: I told them when they first caught me that I was Henry's wife; but I don't remember saying anything about it at the jail. I reckon we lived together as man and wife about a year. Before that time at Stillmore I stayed with Will Williams about two years, but I was married then to Sam McLeod. When Sam got off the gang, Will Williams went to Vidalia and married, and I quit staying with him, and commenced staying with Henry, and got to be his woman. The length of time I stayed with him I wasn't his wife. I was not married to him, just his woman, but told people that I was his wife, because he told me to. I did not claim to him that I was his wife, but he told me to tell everybody that we was man and wife; we did agree to get married at outset, be man and wife and live together under that agreement. We made that agreement at outset, when we first started to living together."

W. J. Sikes, for the State, testified: "I arrested the defendant and this woman. . . She told me that she and Henry were not married, and Henry said they were, and she insisted that they were not married, and Henry insisted that they were." Mamie Kennedy, for the State, testified that Julia McKennie and the defendant came to her house some time before the killing, and "counted themselves as man and wife," and stayed there, and she thought that they were man and wife. Julia McKennie said at her house that they were married. Walter Coleman, for the defendant, testified as follows: Operated a turpentine still about five miles from Vidalia. The defendant lived out there some four or five months this year. This woman [Julia McKennie] lived out there with him as his wife. Don't know whether they were married or not, but they lived there as man and wife. The defendant while out there asked the witness to get them a license so that they could marry.

Sephus Collins, for the defendant testified: The defendant and

this woman lived together as man and wife on my place, as far as I know. Never heard anything to the contrary.

*C. L. Cowart,* for plaintiff in error.

*George M. Napier, attorney-general, J. Saxton Daniel, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.